# GRUBB *v.* GUILFORD ASSOCIATION, INC.

[No. 193, September Term, 1961.]

136

*Decided March 19, 1962.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and MARBURY, JJ.

*George M. Radcliffe* for the appellant.

*Robert C. Prem,* with whom was *George S. Yost* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

The chancellor, at the suit of a neighborhood association, enjoined Dr. Grubb, the appellant, from using the basement of his home, 3607 Greenway, Baltimore, as an office for the practice of medicine, except for such occasional use as might be incidental or supplemental to a regular office elsewhere, having found that the use enjoined had violated a restrictive covenant applicable to the property.

Dr. Grubb contends that the restrictive covenant does not bar his using his home as an office; that, if the covenant would otherwise apply, the Guilford Association, Inc., the appellee (a party to the "Deed and Agreement" which established the covenant), waived the enforcement of the restrictive covenant as to use of the property for a doctor's office; that there has been such a change in the neighborhood as to vitiate the covenant and require equity to refuse enforcement of it; and that injunctive relief should have been denied because of the hardship it imposed on him.

The restrictive covenant dated from 1913, when lots in Guilford, a planned and supervised residential area of Baltimore, were first laid out. It was renewed in 1949 (in the manner provided for in the 1913 "Deed and Agreement") and concededly is in effect. It provides that the land shall be used for private residential purposes only and that no building of any kind, except private dwelling houses designed for occupation by a single family and private accessory garages shall be erected or maintained thereon, and that any waiver thereof must be in writing.

The testimony showed that because of illness and domestic difficulties, Dr. Grubb was in financial straits, felt the need of a combined residence and office, and found the Greenway house suitable and desirable. He converted the basement into a doctor's office, consisting of a hall, a waiting room, an isolation room and an office. The office was equipped with a small refrigerator, syringes and customary medical implements and an electric sterilizer. He employs a receptionist-secretary, who works from nine to five. Dr. Grubb sees, by appointment, an average of eight patients on each of four mornings a week, on which his office hours are from 9:30 A. M. to 1:00 P. M., as a rule, and sometimes sees patients on Saturday morning and Wednesday afternoon. On some days he sees as many as fifteen patients. On the regular and yellow pages of the telephone book, Dr. Grubb's office is listed as 3607 Greenway. He occasionally gives injections to patients at his former regular office on 33rd Street, and he pays for the privilege of doing so.

We think the use of the Greenway house as the regular and main office of an actively practicing doctor violates the covenant restricting its use to residential purposes. The tests were laid down in *Osborne v. Talbot,* 197 Md. 105, 110-111, and *Wells v. Osborne,* 204 Md. 375, 379-380, both of which dealt with the use that Dr. Osborne, a chiropractor, made of a residence in Hagerstown. In the first case a covenant for residential use only was upheld but the injunction appealed from was held too broad because it "in effect refused to recognize any distinction between practice of a profession wholly at or from one's residence and 'incidental' practice to a limited extent in special circumstances * * *." At the time the second case was decided, Dr. Osborne had begun to practice actively and exclusively at his residence, and this Court said:

> "While there is evidence that the practice is not as large as at the Broadway office, and that office hours are not as long, it cannot be described as incidental in any sense. It is the primary and exclusive use to which his training and talents are applied. Nor is it incidental in the sense of occasional, as in the case of a retired physician accepting calls from a few patients, or an active practitioner acting out of usual office hours in urgent or emergency cases. Although a chiropractor is not a physician, there is a close analogy, as noted in our previous decision.
>
> * * *
>
> We suggest that the decree should be modified to enjoin the defendant from the regular use of the premises for the practice of his profession, except as incidental or supplemental to an office elsewhere, or occasionally or in emergencies. His present activities must be discontinued."

We find the considerations that led to the conclusions in *Wells v. Osborne* pertinent here, and the case to be controlling.

Dr. Grubb's contention of acquiescence and estoppel is based on his interpretations of what the presidents of the

Guilford Association said to him, and on the fact that the architectural committee of the Association, and thereafter the Association, approved the plans for, and the construction of, an outside stairwell entrance to the basement of his house.

When Dr. Grubb concluded he wanted to buy the house, he called on the president of the Roland Park Company to discuss the restrictive covenant. He was referred to Mr. Oldham Lewis, the president of the Guilford Association. Dr. Grubb had a series of conversations with Mr. Lewis, telling him of his problems and his desires, although apparently not that he intended to use the house as his primary, if not only, office. Dr. Grubb said: "I felt from what he said * * * that he had become interested in allowing me to do what I wanted." Mr. Lewis testified that he repeatedly told Dr. Grubb that the restrictions in Guilford prohibited a doctor's office except for an occasional patient and that he, Lewis, had no authority to give him a waiver orally or in writing, without instructions from the board of directors. Dr. Grubb admitted that Mr. Lewis told him he would have to maintain his 33rd Street office and see patients there. Dr. Grubb said that he concluded this requirement "was a technicality that one should not have one office only in Guilford." [1]

Mr. Gerald Wise, who succeeded Mr. Lewis as president of the Guilford Association, testified that in his official capacity he told Dr. Grubb flatly a week before he settled for the house that the Guilford restrictions prohibited his using the house as an office. Dr. Grubb admitted this but said that he told Wise to call Lewis and thereafter "was satisfied that the situation had been adjusted."

When Dr. Grubb requested permission to construct an outside stairwell entrance to the basement, Mr. Lewis referred him to the architectural committee, which eventually approved the plans and the construction. Dr. Grubb interpreted this approval as approval of his conversion of the basement interior into an office (for which there were separate plans) and there-

---

1. It appears that over the years three doctors with the approval of the Association had had signs on their residences in Guilford and had seen an occasional or emergency patient at home, and that Dr. Grubb and Mr. Lewis had discussed this.

fore of his proposal to have his office in his home, but, again, the testimony of the officers of the Guilford Association and of the chairman of the architectural committee as to the facts and conversations relating to the stairwell plans was that there was no reasonable basis for such inferences, and that their approval was only as to exterior changes.

It may well be that the Guilford Association walked down the garden path with Dr. Grubb whispering sweet nothings which he, because he wished to, took as a sincere and serious proposal. Mr. Lewis said, "Dr. Grubb drew conclusions that there was no foundation for in fact," perhaps, he felt, because he, Lewis, had tried to be helpful and courteous to a man whom fate had buffeted.

In any event, the chancellor saw the witnesses and heard their conflicting versions of what transpired. He found that Dr. Grubb was told he would be allowed to see "an occasional or infrequent patient * * * but that he was not given permission to conduct his office practice on the premises." He found further that "[t]here was no reasonable basis for whatever other conclusions to the contrary Dr. Grubb may have drawn from a number of personal and telephone conversations" with those representing the Guilford Association and that, therefore, the covenant had not been waived. We cannot say that the chancellor was in error in his findings and we agree with his conclusions.

We find no evidence of change in the neighborhood sufficient to invalidate the restrictive covenant. We think Dr. Grubb's actual knowledge of the covenant before he bought, his unwarranted assumptions as to the intent of the Association, his failure either to obtain a written waiver of the restriction or to require the Association officials to spell out in detail how far they proposed to unbend, and the substantial interest of the Association in maintaining its property rights protected by the covenant, leave no room for the application of the doctrine of comparative hardship, which the appellant urges should be applied to protect him. *Cf. Easter v. Dundalk Holding Co.,* 199 Md. 303, 305, and *Dundalk Holding Co. v. Easter,* 215 Md. 549, 555-556.

*Decree affirmed, with costs.*