660 A.2d 942

The RIDGELY CONDOMINIUM ASSOCIATION, INC.

v.

Nicholas SMYRNIOUDIS, Jr., et al.

No. 1338, Sept. Term, 1994.

Court of Special Appeals of Maryland.

June 28, 1995.

S. Leonard Rottman (Russell G. Alion, Jr. and Adelberg, Rudow, Dorf, Hendler & Sameth, LLC, on the brief), Baltimore, for appellant.

Jonathan E. Claiborne (Whiteford, Taylor & Preston, LLP, on the brief), Towson, for appellees.

Argued before FISCHER, DAVIS, and SALMON, JJ.

SALMON, Judge.

At issue in this case is a bylaw amendment passed by appellant, the Ridgely Condominium Association, Inc. (the Association), prohibiting clients of the seven first-floor commercial condominiums in the Ridgely Condominium regime (the Condominium) from using the lobby to gain access to the commercial units. In their amended complaint[1] filed in the Circuit Court for Baltimore County, appellees, Nicholas Smyrnioudis, Jr. and Nicholas Smyrnioudis, Sr. (owners of Unit 102); George Wilhelm, Merrill I. Berman, and Joseph B. Francus (owners of Unit 103), and Mary E. Granger (owner of Unit 104), requested an "order granting [appellees] an *ex parte* injunction restraining and enjoining [appellant] from

---

1. Appellees' original complaint was filed before the bylaw amendment was passed.

enacting, enforcing, and otherwise putting into effect any rule, by-law or other provision prohibiting or otherwise restricting the clients of [appellees] from entering [appellees'] units and offices through the main central lobby...."

After a two-day hearing, the Circuit Court for Baltimore County (Fader, J.) ordered that the "regulation" and "By-law amendment at issue" were "unreasonable" and "enjoined [appellant] from prohibiting all ingress and egress to commercial units via the main lobby." This appeal followed, and appellant has presented two questions, which we have rephrased and condensed into one:

Did the trial court apply the appropriate standard of review for evaluating the propriety of a condominium by-law amendment?

For the reasons hereinafter explained, we shall answer "Yes" and thus affirm the judgment of the circuit court.

### BACKGROUND

When the Condominium was completed in 1975, Article XV of the Association's bylaws provided that "[a]ll units shall be used solely as a single-family residence, except that up to a maximum of seven (7) units on the first floor may be used as professional offices." Thus, floors two through twenty-eight house residential condominium units, at approximately 9 units per floor, and the first floor contains the seven commercial units.

There are two ways to gain access to reach each of the seven first-floor units: one through the lobby of the complex and one through an exterior door at the rear of the unit. At the hearing, the exterior door was described as "a steel door with a large glass pane in it." Although there is a sidewalk leading to the exterior doors, there is no porch or canopy outside of the entrances. The lobby, on the other hand, which was redecorated in 1990, boasts marble floors and dark wood-panelled walls. It was described by one of the commercial owners as "attractive" and "inviting."

In the spring of 1991, some of the residential owners expressed concern regarding the fact that the clients of the first-floor businesses had access to the lobby and therefore could easily reach the residential floors via the elevator. The specific concerns were summarized by the circuit court in its Memorandum Opinion:

Testimony by residents evidenced the basis of concern for their safety and privacy as follows:

1. rise in crime in the Towson area, especially with the coming of a large nearby shopping mall;

2. lack of security in the garage and exterior parking areas;

3. non-residents entering the building such as advertisers, flower deliverers, people with psychiatric problems and drug addictions visiting the office of the psychiatrists, and other commercial unit invitees as well as the fear of con-artists and other predators of the elderly,

4. traffic in front of the building as a result of the increasing number of commercial unit clients

Three letters were introduced into evidence by the Association showing the concern for safety and privacy which existed in the summer of 1991. The correspondence from residents specifically requested the governing body to improve security and to restrict access. These letters were inspired after, and in spite of the Board's installation of a new card key system to make the garage area safer. In addition to letters, the Board received phone calls regarding security.

In response to these concerns, the Association's Board of Directors (Board), in the summer of 1991, adopted a "resolution" providing, in pertinent part, that "[e]ffective September 1, 1991, clients of commercial units [sic] owners and tenants shall not utilize the Condominium's lobbies." Subsequently, on October 1, 1991, the Association enacted the following bylaw amendment:

Article XV, Section 1

All units shall be used as a single family residence, except that up to a maximum of seven (7) units on the first floor may be used as professional offices, provided however, that all clients of, or visitors to, professional office owners or their tenants shall be required to use the exterior entrances of each such professional office for ingress and egress.

No visitor or clients of any owner of a professional office or tenant thereof, shall be permitted in any other area of the building, unless accompanied by the owner of the office unit or the tenant of such office unit. For the purpose of this section, the terms "client" or "visitor" of professional office owner or tenant, shall include the client or visitor and all person(s) who may accompany such client or visitor to such professional office.

Appellees testified regarding the effect of the access restriction on their businesses. Mr. Nicholas Smyrnioudis, Jr. testified that he and his father own Unit 102 and run an accounting business. In describing the basic lay-out of his office, Mr. Smyrnioudis said that the lobby entrance to his office opens into a reception area and that the exterior entrance opens into a conference room. He further explained that all of his clients currently enter his office from the lobby.

Dr. Joseph Francus, a psychiatrist, testified that he and Dr. Berman, also a psychiatrist, own Unit 103. Explaining that his reception area is located nearest the lobby entrance and that the exterior door opens into his office, Dr. Francus said that no patients or clients had ever used the exterior door as an entrance. Dr. Francus further testified that the lobby is very important to him because his clients are often anxious and uncomfortable about coming to the office and the "nice lobby" makes them feel more comfortable.

Ms. Mary Granger is the owner of commercial Unit 104 and runs a mailing list brokerage and management company. She stated that, although her clients have used both the lobby and exterior entrances, the lobby is very important to her business because it "lends to our credibility as a professional business."

In its Memorandum Opinion, the circuit court first considered the appropriate standard of review. After reviewing the relevant Maryland case law and conducting a thorough and detailed examination of the various theories utilized by out-of-state courts in evaluating condominium use restrictions, the court concluded that "reasonableness" was the appropriate standard of review in Maryland. Applying that standard to the testimony and exhibits presented by the parties, the court determined that, "[w]hile the By–Law in question was properly enacted within the Board's power, the restriction is unenforceable for failure to reasonably relate to the health, happiness and enjoyment of the unit owners."

Appellees proceeded at the circuit court level on the theory that the bylaw amendment was a use restriction that, although properly promulgated in accordance with the Condominium declaration and bylaws, was "unreasonable" in that it unfairly burdened the first-floor commercial owners. Although our review of the record convinces us that this case actually concerns an access restriction that has diluted appellees' respective percentage interests in the Condominium lobby,[2] we

---

**2.** The lobby, which per Paragraph 7(c) of the Ridgely Declaration is explicitly characterized as a common element, was refurbished in 1990 out of common funds consisting of contributions from each unit owner. To deny the use of the lobby to clients of the commercial owners constitutes an *ultra vires* taking of a portion of their percentage interest in the common areas in derogation of the Ridgely Condominium declaration as well as certain provisions of the Maryland Condominium Act. Paragraph 8 of the Ridgely Declaration, in pertinent part, provides:

The percentage interest appurtenant to a unit represents the unit owner's percentage interest in the common expense and common profits of the Condominium, and his undivided share in the common elements of the Condominium.

The percentage interest shall have a permanent character and, except as specifically provided in Title 11, *may not be changed without the written consent of all the unit owners and their mortgagees.*
We note that the above language mirrors that of RP § 11–107, entitled "Percentage interests." For an example of out-of-state cases that directly consider whether certain provisions are properly characterized as "use restrictions," or whether they alter unit owners' property rights in the common areas, see *Makeever v. Lyle*, 125 Ariz. 384, 609 P.2d 1084, 1088 (Ct.App.1980) (holding that contrary to restrictions regard-

shall limit our review to the use-restriction theory presented by the parties. *See County Council v. Offen,* 334 Md. 499, 509, 639 A.2d 1070 (1994) (recognizing the general rule that "an appellate court will not address matters that were not raised or decided in the trial court[.] ...").

## I.

The Condominium is considered a unique form of real property ownership in that it "consist[s] of an undivided interest in common in a portion of a parcel of real property together with a separate interest in space in a residential, industrial or commercial building on such real property." *Andrews v. City of Greenbelt,* 293 Md. 69, 73, 441 A.2d 1064 (1982). The *Andrews* Court elaborated:

> Since a condominium complex usually consists of numerous parties with property interests in the regime, a unit owner agrees as a condition of his purchase to be bound by rules and regulations promulgated by an association of unit owners for the administration and maintenance of the property. Such a condominium owner thus possesses a hybrid form of property interest: one in fee simple to the exclusion of everyone, and the other as a tenant in common with his fellow unit owners.

*Id.* at 73–74, 441 A.2d 1064 (footnote omitted); *see also Starfish Condo. v. Yorkridge Serv.,* 295 Md. 693, 703, 458 A.2d 805 (1983) (recognizing that "unit owners own the common elements in fee as tenants in common").

The condominium as a form of real property ownership is authorized by the Maryland Condominium Act, Md.Code

ing use, a unit owner may not be "deprived of his interest in a substantial portion of the general common elements without his consent"); *Kaplan v. Boudreaux,* 410 Mass. 435, 573 N.E.2d 495, 500 (1991) (holding that the "grant of exclusive use to one unit owner of a common area is sufficient to change the relative interest of the unit owners in that common area"). *See also Jarvis v. Stage Neck Owners Ass'n,* 464 A.2d 952, 956 (Me.1983); *Grimes v. Moreland,* 41 Ohio Misc. 69, 72–73, 322 N.E.2d 699, 702 (1974); *Bd. of Dir. of By the Sea Council v. Sondock,* 644 S.W.2d 774, 781 (Tex.Ct.App.1982).

(1974, 1988 Repl.Vol.), § 11–101 *et seq.* of the Real Property Article (RP). Maryland's initial condominium statute, enacted in 1963 as the "Horizontal Property Act," was patterned after the Federal Housing Administration's "Model Horizontal Property Act." *See* Robert B. Taylor, *Maryland's New Condominium Law: An Analysis,* p. 2–4 (1981), *reprinted in* MICPEL, *Condos, Co-ops & HOA's,* p. 433, 436–438 (1986).[3]

The condominium is created by "recording among the land records of the county where the property is located, a declaration, by-laws, and condominium plat. . . ." RP § 11–102(a). The declaration is "the basic instrument subjecting the property to condominium use" and therefore contains "a legal description of the land, a legal description of each unit, and a description of the common elements." 4B Richard R. Powell, *The Law of Real Property,* Par. 633–7[2] (1977). The minimum requirements for the contents of a condominium Declaration in Maryland are set forth in RP § 11–103.

RP § 11–109(a) provides that "[t]he affairs of the condominium shall be governed by a council of unit owners . . . comprised of all unit owners." If the Council of Unit Owners is incorporated, the bylaws, which are recorded with the declara-

---

**3.** Condominium type ownership has been traced back as far as the 12th century in Europe. Patrick J. Rohan & Melvin A. Reskin, *Condominium Law & Practice* § 2.01, p. 2–2 (1965). The condominium surfaced in Puerto Rico in the 1950's but did not appear on the mainland United States until the early 1960's. *Andrews, supra,* 293 Md. at 74, n. 5, 441 A.2d 1064. The Andrews Court explained:

> [The condominium's] acceptance on the mainland . . . was somewhat restrained until 1961 when Congress passed legislation authorizing the Federal Housing Administration (FHA) to make mortgage insurance available for the condominium form of ownership as long as the state in which the property was located had established its real property existence. . . . This federal action prompted numerous state legislatures to pass laws authorizing condominium ownership in their states.

*Id.* The first condominium in the United States was the "Greystoke," built in Salt Lake City, Utah in 1962. Carl B. Kress, *Beyond Nahrstedt: Reviewing Restrictions Governing Life in A Property Owner Association,* 42 UCLA L.Rev. 837, 842, n. 22 (1995) (citing Community Associations Institute, *Community Associations Factbook,* p. 11 (Clifford J. Treese ed., 1993)).

tion, become the bylaws of the corporation. RP § 11–104(a). The basic administration of a condominium complex, *e.g.*, meetings, voting, collection of common expenses, etc., is governed by the bylaws. RP § 104(a). In addition, pursuant to RP § 11–111, the "council of unit owners or the body delegated in the bylaws of a condominium to carry out the responsibility of the council of unit owners may adopt rules for the condominium."

In this case, the Condominium documents (including the declaration), articles of incorporation for the Association, and bylaws, were admitted at trial. In the text of the initial Board "regulation" restricting lobby access, the Board stated that it was acting pursuant to Article VIII, Section 3 of the bylaws, which section defines the Board's general powers and duties, and provides that "[t]he Board of Directors shall be responsible for ... the promulgation of uniform rules and regulations respecting the use and occupancy and maintenance of the project[.] ..." The bylaw amendment containing the lobby restriction was passed pursuant to the amendment procedures provided in Article XXI, § 1:

> These By–Laws may be amended at any duly constituted meeting of the members of the Association, provided the notice of the meeting shall specify the amendment to be voted upon, and provided the amendment is approved by at least 66⅔% of the votes....

We note that RP § 104(c) permits the inclusion of use restrictions in the bylaws:

> The bylaws also may contain any other provision regarding the management and operation of the condominium including any restriction on or requirement respecting the use and maintenance of the units and the common elements.

Focusing on the differences between a Board rule or regulation on the one hand, and a bylaw on the other, appellant argues that the judicial standards under which each should be evaluated are quite different. Although appellant concedes that "reasonableness" is the appropriate standard of review for evaluating a rule or regulation promulgated by the Board

of Directors, it argues that a less restrictive standard of review should be required when reviewing a bylaw. Relying on cases from other jurisdictions, appellant posits that "use restrictions contained in the Declaration or By–Laws of a condominium association carry a strong presumption of validity and may not be invalidated unless they are wholly arbitrary or in violation of public policy or of some fundamental constitutional right." Appellant concludes that, inasmuch as the circuit court failed to acknowledge the inherent difference between a Board-passed rule and a bylaw, it erred in applying the reasonableness test to the use restriction at issue.

## II.

The issue of what is the appropriate standard of review for evaluating a condominium bylaw amendment is one of first impression in Maryland. We begin by noting that this Court has recognized the reasonableness test as the standard of judicial review for evaluating use regulations promulgated by a condominium Board. *Dulaney Towers v. O'Brey,* 46 Md. App. 464, 418 A.2d 1233 (1980). *Dulaney Towers* involved the enforcement of a Board-passed regulation that prevented unit owners from owning more than one dog or cat. In commenting on the rule making power of condominium associations in general, we said that "communal living requires that fair consideration ... be given to the rights and privileges of all owners and occupants of the condominium so as to provide a harmonious and residential atmosphere." *Id.* at 466, 418 A.2d 1233.

We recognized in *Dulaney Towers* that the majority of courts have said "that if house rules are reasonable, consistent with the law, and enacted in accordance with the bylaws, then they will be enforced." *Id.* (citing Louise Hickok, *Promulgation and Enforcement of House Rules,* 48 St. John's L.Rev. 1132, 1135 (1974)); *see also* Patrick J. Rohan & Melvin A. Reskin, *Condominium Law & Practice* § 10.02. p. 10–11 (1981, 1989 supp.); Note, *Judicial Review of Condominium Rulemaking,* 94 Harv.L.Rev. 647, 658 (1981); Jeffrey A. Goldberg, *Community Association Use Restrictions: Apply-*

*ing the Business Judgment Doctrine,* 64 Chicago–Kent L.Rev. 653, 655 (1988).[4]

The case most cited for first enunciating the reasonableness test in the context of reviewing condominium regulations is *Hidden Harbor Estates v. Norman,* 309 So.2d 180, 181 (Fla. Dist. 4 Ct.App.1975):

> It appears to us that inherent in the condominium concept is the principle that to promote the health, happiness, and peace of mind of the majority of the unit owners since they are living in such close proximity and using facilities in common, each owner must give up a certain degree of freedom of choice which he might otherwise enjoy in separate, privately owned property. Condominium unit owners comprise a little democratic sub society of necessity more restrictive as it pertains to use of the condominium property than may be existent outside the condominium organization. . . .
>
> Certainly, the association is not at liberty to adopt arbitrary or capricious rules bearing no relationship to the health, happiness and enjoyment of life of the various unit owners. On the contrary, we believe the test is reasonableness. If a rule is reasonable the association can adopt it; if

---

4. As Judge Fader pointed out in his memorandum opinion, other theories utilized in reviewing use restriction provisions include constitutional principles, contract theories, and the "business judgment" standard commonly associated with corporation law. *See generally, Judicial Review of Condominium Rulemaking, supra,* 94 Harv.L.Rev. 647. This Court acknowledged the "business judgment" standard in *Black v. Fox Hills,* 90 Md.App. 75, 81–82, *cert. denied,* 326 Md. 177 (1992). In that case, certain property owners in a community brought suit against the Fox Hills North Community Association, claiming that the Fox Hills Board of Directors had erroneously approved their neighbor's fence as complying with a specific declaration provision regarding fences. After citing a New Jersey case dealing with the enforcement of a condominium rule, we stated that the business judgment rule "precludes judicial review of a legitimate business decision of an organization, absent fraud or bad faith." *Id.* at 82. We note that the case at hand is different in that we are not dealing with the enforcement by the Board of an otherwise legitimate rule or bylaw in a specific instance but rather are confronted with the legitimacy of a specific provision as a whole.

not, it cannot. It is not necessary that conduct be so offensive as to constitute a nuisance in order to justify regulation thereof. Of course, this means each case must be considered upon the peculiar facts and circumstances thereto appertaining.

While the above test is most often applied to Board-passed use restrictions, *i.e.,* rules and regulations, some courts have characterized "reasonableness" as too strict a standard when reviewing use restrictions appearing in original condominium documentation such as the declaration. In *Hidden Harbor Estates v. Basso,* 393 So.2d 637, 639–40 (Fla.Dist. 4 Ct.App. 1981), the Florida intermediate appellate court explained its reasons for adopting a two-tiered standard:

There are essentially two categories of cases in which a condominium association attempts to enforce rules of restrictive uses. The first category is that dealing with the validity of restrictions found in the declaration of condominium itself. The second category of cases involves the validity of rules promulgated by the association's board of directors or the refusal of the board of directors to allow a particular use when the board is invested with the power to grant or deny a particular use.

In the first category, the restrictions are clothed with a very strong presumption of validity which arises from the fact that each individual unit owner purchases his unit knowing of and accepting the restrictions to be imposed. Such restrictions are very much in the nature of covenants running with the land and they will not be invalidated absent a showing that they are wholly arbitrary in their application, in violation of public policy, or that they abrogate some fundamental constitutional right. See, *White Egret Condominium, Inc. v. Franklin,* 379 So.2d 346 (Fla. 1979). Thus, although case law has applied the word "reasonable" to determine whether such restrictions are valid, this is not the appropriate test, and to the extent that our decisions have been interpreted otherwise, we disagree. Indeed, a use restriction *in a declaration of condominium* may have a certain degree of unreasonableness to it, and

yet withstand attack in the courts. If it were otherwise, a unit owner could not rely on the restrictions found in the declaration of condominium, since such restrictions would be in a potential condition of continuous flux.

The rule to be applied in the second category of cases, however, is different. In those cases where a use restriction is not mandated by the declaration of condominium per se, but is instead created by the board of directors of the condominium association, the rule of reasonableness comes into vogue. The requirement of "reasonableness" in these instances is designed to somewhat fetter the discretion of the board of directors. By imposing such a standard, the board is required to enact rules and make decisions that are reasonably related to the promotion of the health, happiness and peace of mind of the unit owners.

*Id.* at 639–40 (emphasis in original).

Citing *Basso,* the Supreme Court of California recently applauded the concept of applying a less restrictive standard of review to use restrictions appearing in original condominium documentation. *Nahrstedt v. Lakeside Village Condominium Assoc., Inc.,* 8 Cal.4th 361, 33 Cal.Rptr.2d 63, 878 P.2d 1275, 1284 (1994). The Court explained that the relaxed standard "encourages the development of shared ownership housing—generally a less costly alternative to single-dwelling ownership—by attracting buyers who prefer a stable, planned environment" and "also protects buyers who have paid a premium for condominium units in reliance on a particular restrictive scheme." *Id.* Explaining that the California legislature had explicitly likened condominium use restrictions to "covenants" that were to be enforced as "equitable servitudes," the Court stated:

When courts accord a presumption of validity to all such recorded use restrictions and measure them against deferential standards of equitable servitude law, it discourages lawsuits by owners of individual units seeking personal exemptions from the restrictions. This also promotes stability and predictability in two ways. It provides substantial assurance to prospective condominium purchasers that

they may rely with confidence on the promises embodied in the project's recorded CC & R's [covenants, conditions, and restrictions]. And it protects all owners in the planned development from unanticipated increases in association fees to fund the defense of legal challenges to recorded restrictions.

*Id.* at 1288.

### III.

In the instant case, appellant urges us to adopt the less restrictive standard for reviewing the bylaw provision at issue. While recognizing that we are dealing with a bylaw provision, rather than a declaration provision as was the case in the *Nahrstedt* and *Basso* decisions, appellant perceives no significant difference inasmuch as both declaration provisions and bylaw provisions are required to be recorded in Maryland. *See* RP § 11–102(a); RP § 11–104(a).

We agree that the recording requirement is significant. The main reason for applying a deferential standard of review to recorded use restrictions is that "each individual unit owner purchases his unit knowing of and accepting the restrictions to be imposed." *Basso, supra,* 393 So.2d at 639.[5] Consequently, in upholding the less restrictive standard, courts have compared recorded condominium use restrictions to restrictive covenants or equitable servitudes. *Nahrstedt, supra,* 878 P.2d at 1288; *Basso, supra,* 393 So.2d at 639–40.

The Maryland Court of Appeals has recognized, in restrictive covenant cases, that a landowner is generally bound by unambiguous use restrictions appearing in the deed. *Eisenstadt v. Barron,* 252 Md. 358, 371, 250 A.2d 85 (1969); *Grubb v. Guilford Ass'n,* 228 Md. 135, 140, 178 A.2d 886 (1962). In *Eisenstadt,* a case dealing with the enforcement of a covenant concerning the use of a water line, the Court said:

---

**5.** In Maryland, RP § 11–126(b)(2) provides that, before a contract of sale for a condominium is entered, the prospective purchaser must receive a copy of the "proposed declaration, bylaws, and rules and regulations."

[Appellant] is in no position to complain that the restrictions were not within reasonable bounds. We think they were within reasonable bounds, but [appellant] knew of the water line restriction. He accepted the deed. The restriction is clear and unambiguous....

Similarly, in *Grubb,* the Court considered a restrictive covenant that prevented the defendant homeowner from using the basement of his home for other than residential purposes. In upholding the Guilford Association's enforcement of the restrictive covenant against the homeowner, the Court recognized that the owner had had "actual knowledge of the covenant before he bought." *Id.* at 140, 178 A.2d 886. In addition, the Court emphasized the "substantial interest of the [homeowner's] Association in maintaining its property rights protected by the covenant." *Id.*

■ To the extent that the reasoning from the above restrictive covenant cases can be analogized to condominium law, we agree that recorded use restrictions appearing in original condominium documentation deserve a higher degree of deference than those promulgated by a condominium Board of Directors. We emphasize, however, that in the case at hand, we are dealing with a bylaw *amendment* that was passed many years after appellees bought their units. This is an important difference, because the application of the less restrictive standard is based upon the concept that the unit owners had notice of the recorded use restrictions when they purchased their units. In this case, the notice aspect is lacking.

Some courts, although not directly considering amendments, have hinted that they would apply a stricter standard to amendments than to original provisions. *Nahrstedt, supra,* 878 P.2d at 1284; *Noble v. Murphy,* 34 Mass.App.Ct. 452, 612 N.E.2d 266, 270 (1993) (recognizing that "[a] condominium use restriction appearing in originating documents which predate that purchase of individual units may be subject to even more liberal review than if promulgated after units have been

individually acquired."); *Bluffs of Wildwood Homeowners' Ass'n v. Dinkel*, 96 Ohio App.3d 278, 282–83, 644 N.E.2d 1100, 1103 (1994) (acknowledging that where a use restriction "is contained in a condominium declaration and is in existence prior to the purchase of a condominium unit, the reasonableness test has less relevance").

Other courts, however, have expressly treated an amendment the same as an original recorded provision, on the basis that the unit owner had notice of the provisions and procedures for amending a recorded provision when the unit was purchased. *Flagler Fed. Sav. v. Crestview Towers*, 595 So.2d 198 (Fla.Dist. 3 Ct.App.1992) (upholding a Declaration amendment prohibiting the leasing of units); *Kroop v. Caravelle Condominium, Inc.*, 323 So.2d 307 (Fla.Dist. 3 Ct.App.1975) (upholding amendment to Declaration on basis that owner had acquired title with knowledge that it could later be amended); *Mcelveen–Hunter v. Fountain Manor Ass'n*, 96 N.C.App. 627, 386 S.E.2d 435 (Ct.App.1989), *aff'd per curiam*, 328 N.C. 84, 399 S.E.2d 112 (N.C.1991) [6].

## IV.

With all of the above in mind, we turn to Maryland law and the bylaw amendment at issue in the case at hand. In considering the proper standard of a review for a condominium bylaw amendment in Maryland, we note that, pursuant to RP § 11–104(e), bylaws "may be amended by the affirmative vote of unit owners having at least 66⅔% percent of the votes

---

6. Appellant relies on our decision in *Oakhampton v. Reeve*, 99 Md.App. 428, 637 A.2d 879 (1994), as supporting the proposition that the amendment in the instant case should be reviewed under a more deferential standard of review. Without elaborating, we simply note that appellant's reliance on *Oakhampton* is misplaced because that case dealt with the action of a homeowner's association rather than a condominium association. In *Oakhampton*, we expressly recognized, and based our holding upon, the fact that homeowners' association members *do not possess the same property interest in the common areas* that condominium owners enjoy. *Id.* at 438–39, 637 A.2d 879.

in the council of unit owners." [7]   By way of comparison, to amend a declaration provision, "the written consent of 80% of the unit owners listed on the current roster" is required. RP § 11–103(c). Moreover, paragraph 20 of the Ridgely Condominium Declaration requires that, in order to amend the Ridgely Declaration, *every unit owner* must provide written consent.

The relative ease by which bylaws may be amended in Maryland supports the proposition that the reasonableness test, rather than the less restrictive standard, should be applied by courts reviewing bylaw amendments containing use restrictions. In addition, RP § 11–108, entitled "Use of common elements," is relevant:

> (a) The common elements may be used only for the purposes for which they were intended and, except as provided in the declaration, *the common elements, shall be subject to the mutual rights of support, access, use, and enjoyment by all unit owners.*

(Emphasis added). The above language is key in that it lends support to the egalitarian concept that, inasmuch as unit owners own the common elements as tenants in common (see Part I), any common area use restrictions that are imposed should apply equally to all unit owners, unless otherwise stated in the declaration.[8]

---

7.  Although the Association's bylaws originally required a 75% affirmative vote, the bylaws were amended in 1981 to reflect the statutory minimum.

8.  Paragraph 7C of the Ridgely Declaration, with one significant difference, mirrors the language of RP § 11–108, discussed above. Paragraph 7C provides that "the common elements ... *except as provided in the By–Laws,* shall be subject to mutual ... use and enjoyment by all unit owners" (emphasis added), while RP § 11–108(a) contains the phrase *"except as provided in the declaration"* (emphasis added). In this case, the bylaw amendment restricting use of a common element, the lobby, affects only 7 unit owners and therefore is not in conformity with the mutuality of use requirement contained in RP § 11–108(a). The trial court was of the opinion that the bylaw amendment at issue did not violate Paragraph 7C of the Ridgely Declaration, however, because, as discussed above, that section explicitly contains the phrase

The nature of the particular bylaw amendment at issue exemplifies why the reasonableness test should be applied to bylaw amendments concerning use restrictions. The amendment only affects 7 out of 232 units—the only 7 that are designated as commercial rather than residential units. The basic nature of this set up naturally creates competing interests between the residential and commercial owners. With the commercial units in the extreme minority, applying a restrained, deferential standard to use restrictions that do not apply to all units equally could potentially lead to the demise of the commercial units as additional discriminatory use restrictions are passed. As appellees pointed out at trial, the only Condominium document that contains the provision authorizing the first-floor commercial units is the bylaws. Taking it to the extreme, counsel for appellees pointed out that, applying appellant's theory, the Association could "pass a bylaw that says that we are not going to have any more commercial units starting tomorrow...."

We find significance in the fact that Article XV, § 13 of the Association bylaws provides the following regarding the promulgation of Board rules and regulations:

> Reasonable regulations concerning the use and occupancy of the Condominium units and common elements, *if uniformly applicable to all units,* may be adopted by the Board of Directors, which *regulations may be amended from time to time by the Board....*

(Emphasis added). In addition, Article VIII, § 3, which section the Board explicitly cited for the authority to pass the original resolution, provides that the Board "shall be responsible for ... the promulgation of *uniform* rules and regulations respecting the use and occupancy and maintenance of the project." (Emphasis added).

---

"except as provided in the bylaws." Although neither party raised the issue of whether the bylaw amendment conformed, or was required to conform, to RP § 108(a), we note that that section, by only allowing exceptions to the mutuality of use requirement in the *declaration,* arguably shows a legislative intent to disallow regulations or bylaw amendments that restrict an owner's interests in the common elements.

Clearly, the Association bylaws explicitly contemplated that Board-passed rules regarding use restrictions be "reasonable" and that they apply equally to all unit owners. Appellant has hinged its whole argument, however, on the fact that the Association passed a bylaw a month after it passed the "resolution." This action, in appellant's view, served to circumvent these requirements because, coincidentally, neither the Ridgely Condominium documents nor the Maryland Condominium Act explicitly impose the uniformity and reasonableness requirements on bylaw amendments pertaining to use restrictions.

Nonetheless, we hold that the appropriate standard of review for evaluating a condominium bylaw amendment containing a use restriction is reasonableness. While we recognize that a more deferential standard may be employed when considering provisions contained in original condominium documentation, we emphasize that later adopted provisions that are passed by less than unanimous approval of all unit owners have the potential to discriminate against certain classes of owners.[9] Thus, one factor that should weigh heavily in applying the reasonableness test is uniformity.

In this case, the circuit court applied the reasonableness test and, based in part on the fact that the use restriction provision did not treat all unit owners equally, as well as other factors, determined that the provision did not "reasonably relate to the health, happiness and enjoyment of unit owners." Inasmuch as we have held that the court applied the correct standard of review, and appellant has not challenged the court's factual determination under the reasonableness test as clearly erroneous, we perceive no error.

---

9. For a thorough, recent discussion of condominium use restriction provisions and the two-tiered standard of review, see Carl B. Kress, *Beyond Nahrstedt: Reviewing Restrictions Governing Life in a Property Owner Association,* 42 U.C.L.A.L.Rev. 837, 873–74 (1995) (analyzing the California Supreme Court's decision in *Nahrstedt, supra,* and suggesting that use restrictions adopted later, and thus not appearing in original documentation, be afforded less deferential review because they do not have the "level of presumed support by the entire membership").

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.