22 A.3d 158 (2011)
421 N.J. Super. 56
CAPE MAY HARBOR VILLAGE AND YACHT CLUB ASSOCIATION, INC., Plaintiff-Respondent,
v.
Deborah L. SBRAGA, Defendant-Appellant, and
Fred Ahrens and Century 21 Gilmartin & Co., Defendants.
No. A-6122-09T1.
Superior Court of New Jersey, Appellate Division.
Argued May 2, 2011.
Decided July 14, 2011.
*160 John C. Eastlack, Jr. argued the cause for appellant (Weir & Partners LLP, attorneys; Mr. Eastlack, on the briefs).
Norman W. Briggs, Marmora, argued the cause for respondent (Briggs Law Office, LLC, attorneys; Mr. Briggs and Elizabeth F. Casey, on the brief).
Before Judges LISA, SABATINO and ALVAREZ.
The opinion of the court was delivered by
LISA, P.J.A.D.
The dispute in this case pertains to an amendment to the Declaration of Covenants and Restrictions (Declaration) of a private residential community in the City of Cape May known as Cape May Harbor Village and Yacht Club. The amendment prohibits homeowners from leasing their homes to third parties. Appellant, Deborah L. Sbraga, is a homeowner in the community. She leased her home in violation *161 of the amended Declaration, which prompted Cape May Harbor Village and Yacht Club Association, Inc. (Association) to initiate this litigation, seeking injunctive relief against her. The Association is a nonprofit corporation which has as its members all of the homeowners in the community and which, through its Board of Trustees, is responsible for the management of the affairs of the community. Appellant counterclaimed, seeking a declaration that the amendment to the Declaration was void, and also seeking damages.
In ruling on the parties' cross-motions for summary judgment, the trial court applied a standard of reasonableness, found that the amendment satisfied that standard, and therefore entered final judgment granting the Association's motion and denying appellant's. Accordingly, the judgment declared that the amendment to the Declaration was valid and enforceable, and restrained and enjoined appellant from leasing her property, effective December 1, 2010.[1]
Appellant argues that the court erred in the manner in which it applied the reasonableness standard when finding that the Association's action to prohibit her exercise of a fundamental property right was legally permissible. Appellant further argues that the amendment to the Declaration, adopted after she took title to the property, cannot be enforced against her.[2] We reject these arguments and affirm.

I.
The Declaration, executed by the initial developer of the community, was filed in the Cape May County Clerk's office in 1995. The community is small and exclusive, consisting of twenty-four single-family homes, common areas, and a marina. There are forty boat slips, some of which are owned by homeowners, and others by the Association. During this litigation, the homes were assessed for local real estate property tax purposes at between $1,181,900 and $1,705,700. At the time judgment was entered, three homes were listed for sale at prices ranging from $2,545,000 to $2,699,000.
Appellant and her husband purchased a vacant lot in the community in June 2000. A home was constructed on the lot in 2005. Because of a divorce, the property was placed solely in appellant's name in May 2007. Throughout this time, appellant's intention was to occupy the home as a personal residence.
In its original form, the Declaration contemplated the leasing of homes and boat slips. These were the applicable provisions:
(n) Leases. (i) No Owner may lease less than the entire Lot except that any boat slip appurtenant to a Lot may be leased apart from the Lot.
(ii) Any lease on any Dwelling or boat slip shall be in writing and shall be *162 subject to the provisions of this Declaration (whether or not such documents have been provided to the tenant); and any failure of the tenant to fully comply with the provisions of this Declaration shall constitute a material default under the lease and be grounds for termination and eviction. If any tenant is in violation of any of the provisions of this Declaration, the Association may bring an action in its own name or in the name of the Owner, or both, to have the tenant evicted or to recover damages, or both. If the court finds that the tenant has violated any of the provisions of this Declaration, the court may find the tenant guilty of violating the lease and order summary dispossession of the tenant despite the fact that the Owner is not a party to the action and/or that the tenant is not otherwise in violation of tenant's lease or other rental agreements with Owner. For purposes of granting the summary dispossession action against the tenant, the court may consider the Owner a person in whose name a contract (the lease or rental agreement) was made for the benefit of another (the Association). The remedy provided by this subsection is not exclusive and is in addition to any other remedy or remedies available to the Association. The Association may recover all of its costs incurred in pursuing such action, including court costs and reasonable fees for legal counsel, and such costs shall be an Assessment against the Dwelling and the Owner. The Association shall give the tenant and the Owner written notice of the nature of the alleged violation and fourteen (14) days from the mailing of the notice in which to cure the violation before the Association may file for eviction. By becoming a tenant, each tenant agrees to be bound by this Declaration and recognizes and accepts the right and the power of the Association to evict the tenant for any violation by the tenant of this Declaration.
. . . .
(iv) The Owner shall promptly furnish to the Board a clear and complete copy of any lease, either for a Dwelling or boat slip, along with the name and telephone number of the tenant/lessee.
By its terms, the Declaration could be amended only by a vote[3] of at least 67% of all members of the Association.[4] By the summer of 2009, apparently in the aftermath of her divorce and for financial reasons, appellant decided to put her home up for sale. Because of the depressed real estate market, obtaining a favorable sale price would have been difficult. Accordingly, appellant decided she would like to lease the property while she was trying to sell it in order to bring in some revenue. She could optimize such revenue by making weekly rentals during the summer season.
In June 2009, appellant approached George Via, the President of the Association, to clarify whether she was permitted to lease her home. In his deposition testimony, Via confirmed that none of the property owners had ever leased their homes during the history of the community. Indeed, Via said he was unaware that *163 the Declaration allowed for leasing of homes and was of the belief that such activity was prohibited. After appellant approached him about her intention to lease her home, Via discussed the matter with other Association members, and Via testified that they were also unaware of any such authorization. These events provided the motivation for considering the amendment.
At the Association's annual meeting of August 28, 2009, a proposed amendment was presented to the membership that would prohibit leasing of homes. After a discussion, the amendment was approved by a vote of twenty in favor and three opposed. The leasing of boat slips was unaffected by the amendment.
The recorded meeting minutes reflected that members discussed concerns involving problems of living in a homeowner community where rentals were permitted, the negative impact on home values, anticipated problems with renters using the common area and dock, parking problems, and the lack of responsibility for noise and policing of infractions of the Association's rules and regulations.
In his deposition, Via, a long-time member of the Association Board of Trustees, testified that it had never been brought to his attention that a social gathering at a home caused unruly behavior. The Board had never taken formal action due to any unruly behavior at a social gathering or for any other reason pertaining to any of the homes and their use.
However, Via described problems the Association had encountered with renters of boat slips at the marina. For example, one boat owner was running a charter service, which the Association required him to discontinue. There were occasions when the Association had to direct people not to "stay" or "live" on their boats. Children sometimes misbehaved in the marina area, jumping from the boardwalk to the dock, jumping into the water from the docks, going on people's boats and the like. Via called the police on two occasions because of the inappropriate behavior of children at the marina. Via also described an incident in which a boat slip lessee had a "very loud party," and was asked not to return the next season. On another occasion, boat slip lessees returned from a fishing trip, were drinking on the dock, and swearing while other boat slip owners were nearby with children. A letter was sent by the Association to one boat owner explaining that he could not fuel his boat from the dock.
Via explained that the Association had no one who would be able to enforce violations of the Declaration for the homes. Basically, there had never been any problems with noise or unruly behavior by the owner-occupants of the homes or their families or guests, and the Association members wanted to keep it that way. It was anticipated that weekly tenants would not be likely to have the same concerns and attitudes about the importance of maintaining a quiet residential neighborhood atmosphere. This community was not a typical seasonal rental area that commonly exists in many New Jersey seashore communities, and the Association members were determined to preserve the stable and non-transient character of their community.

II.
The judge began his analysis of the issues presented on the cross-motions for summary judgment by considering whether judicial review of the amendment should be guided by the reasonableness standard or the business judgment rule. In doing so, he analyzed in detail our decision in Mulligan v. Panther Valley Property *164 Owners Association, 337 N.J.Super. 293, 766 A.2d 1186 (App.Div.2001). He concluded that Mulligan did not adopt wholesale either test, but instead identified factors to guide a court in determining which test is appropriate depending upon the circumstances of the case. Applying the principles we discussed in Mulligan, the judge determined that, notwithstanding the fact that the amendment was passed by a supermajority of the entire membership of the Association, a factor which would support the more deferential business judgment rule,[5] other factors weighed more heavily in favor of the less deferential reasonableness standard. Those factors were (1) that the restrictions under review were the result of an amendment, not the original Declaration, (2) that the restriction occurred after appellant bought into the community, (3) there were no prior restrictions on renting properties, and (4) "the fact that it impacts on a property right." Accordingly, the judge concluded that all of those factors
militate in favor of the amendment being entitled to less respect than it might otherwise, or, in the terms of Mulligan, in this case I think it would be appropriate to apply the reasonableness standard rather than the business judgment standard, which would mean that this amendment was not as protected as it might otherwise be.
Thus, the court proceeded to apply the reasonableness standard to the facts of the case.[6] Noting the difficulty in defining the reasonableness standard, the court considered two approaches. Under one, the inquiry would be "whether the action was reasonable, or perhaps rational, in the most general sense," that is, whether "there [was] some reasonable basis for the action." Stated differently, the court described the inquiry as, "[i]f it just makes no sense at all, there's no logic behind it, I think that is the test." This approach is akin to our comment in Mulligan that if a court is unable "to perceive any reason in logic or policy" underlying the restriction in question, the restriction would not pass the reasonableness test. Mulligan, supra, 337 N.J.Super. at 312, 766 A.2d 1186.
Alternatively, the court considered that one might address reasonableness as a balancing analysis to determine whether the amendment was more reasonable than not. The court rejected this approach as illogical. Applying the former reasonableness inquiry, the court concluded as follows:
[M]y ultimate conclusion was that this particular amendment still satisfies the reasonableness standard in the sense that it was generally reasonable. That it's understandable how the association, or the supermajority of the homeowners, would want the result that they've requested, which is to say that it's not unreasonable, it's not irrational. It's not a circumstance where the rationale for *165 the adopting of the rule is simply unclear, where one cannot in the record detect a reasonable basis for the action that's been taken.
The court suggested that the homeowners, in good faith, could determine it was in the best interests of the community to adopt this restriction on leasing. It noted that the community was small, exclusive, and had no history of rentals. The court also determined that it was "legitimate" to forecast that having tenants in the community could have an "impact on the neighborhood" and its image, and that members might prefer the community not to have a "transient flavor." Additionally, the court observed that condominium associations and homeowners associations often place restrictions, though perhaps not absolute, on renting. The court conceded the analysis might change if there were a history of homeowners renting, or if the community was larger, with "thousands of homes," or if it was not a "somewhat exclusive community."
The court also addressed appellant's argument that the amendment was an unreasonable restraint on the alienability of her property. The court noted that when one becomes a part of a homeowners association, "one does, in fact, potentially face some restrictions on the ability to use and even alienate one's property." Thus, while it was appropriate to consider the public policy against restricting alienability of property, that policy did not act as an absolute bar to implementing reasonable restrictions. The court concluded that prohibiting leasing appeared to be an available choice of action so long as the procedure was appropriately followed and it passed the reasonableness test, which it did because the record provided a rational basis for the amendment.

III.

A.
Our review of an order granting summary judgment is de novo, and we apply the same standard that governs the analysis by the trial court. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div.), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998). We first determine whether, giving the non-moving party the benefit of all reasonable inferences, the movant has demonstrated that there are no genuine issues of material fact. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). Next, we analyze whether the trial court's application of the law was correct. Ibid. In carrying out our review, we owe no deference to the trial court's interpretation of the law. See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995).

B.
Appellant's argument can be simply stated: When she purchased this property, there was no prohibition against leasing, and any subsequently-imposed restriction on leasing cannot apply to her because it would impermissibly deprive her of a valuable property right and constitute a disfavored restraint on the alienation of property. Indeed, appellant urges a per se rule in this regard. This position ignores two important considerations. First, although the original Declaration did not prohibit (and indeed contemplated) leasing of homes, it also contained provisions authorizing amendments of its provisions. Therefore, any purchaser was on notice that the provisions in the Declaration were not immutable. Second, the reasonableness rule, by its very nature, requires a fact-sensitive analysis of the restriction on a case-by-case *166 basis, taking into consideration all relevant circumstances.
We agree with appellant that the restriction here is a significant one, in that it does affect a fundamental property right and not some less significant aspect of the manner in which properties are used. The trial court took this into consideration as one of the factors favoring application of the reasonableness standard rather than the business judgment rule. We agree with that approach. We also believe that the significance of the right being restricted warrants a deeper analysis of how the reasonableness standard should be analyzed and applied in this case.

C.
In Mulligan, we considered amendments to a declaration governing a common interest community that was comprised of more than 2,000 residential units including single family homes, townhouses, and condominium units. Mulligan, supra, 337 N.J.Super. at 301, 766 A.2d 1186. The community in this case is materially different in its characteristics, and, prior to appellant doing so, no home in the community had ever been leased to a third party in the community's history. Indeed, when appellant bought into the community, she had no intention of acquiring an investment property for rental. She intended only personal use. Therefore, she can claim no detrimental reliance that induced her to make the initial acquisition. It was not until nine years after her acquisition that she decided to rent, and, even then, it was only as a stopgap measure until she could sell the property.
In Mulligan, we recognized the split among jurisdictions between application of the reasonableness standard and the business judgment rule, and we noted that the reasonableness standard appeared to constitute the majority view. Id. at 302, 766 A.2d 1186. Eschewing a blanket rule, however, we held that the particular circumstances of each case would guide which rule is more appropriate. As we have stated, the reasonableness standard is more appropriate in this case particularly because the amendment was enacted after appellant's acquisition and because the amendment affects a fundamental property right. Those circumstances outweigh the countervailing circumstance that, in accordance with the requirement in the Declaration, the amendment was accomplished by a supermajority vote of the full membership. That said, we proceed to further explore the criteria for determining what is reasonable in the context of restrictions imposed in common interest residential developments.
Common interest developments are a relatively recent phenomenon, but such developments have rapidly grown in the United States. Id. at 301, 766 A.2d 1186. These developments are relatively common in New Jersey, in comparison to the other states. Ibid. Condominiums, one form of the common interest development, are governed by the Condominium Act, N.J.S.A. 46:8B-1 to -38(Act). Other common interest developments are not governed by the Act, but in certain contexts, the Act is considered instructive and is used for guidance. Mulligan, supra, 337 N.J.Super. at 301, 766 A.2d 1186.
Homeowners associations in common interest developments (as opposed to condominiums) do not arise out of a statute. Highland Lakes Country Club & Cmty. Ass'n v. Franzino, 186 N.J. 99, 110, 892 A.2d 646 (2006). A homeowners association is created by filing a "declaration of covenants, conditions and restrictions contained in deeds and association bylaws." Ibid. The covenants include restrictions and conditions that run with the land and *167 bind all current and future property owners. Ibid. The bylaws set forth rules and regulations governing the association's members. Id. at 111, 892 A.2d 646.
In condominium communities, as well as other common interest developments, owners take title subject to a master deed or declaration:
Restrictive covenants are used to maintain or enhance the value of land by reciprocal undertakings that restrain or regulate groups of properties. These covenants are common in condominium and other "common-interest" housing subdivisions. Prior to selling the first unit or plat, the subdivision or condominium owner creates a declaration or master deed that contains all of the restrictions. Property owners who purchase their properties subject to such restrictions give up a certain degree of individual freedom in exchange for the protections from living in a community of reciprocal undertakings.
[Villas W. II of Willowridge Homeowners Ass'n, Inc. v. McGlothin, 885 N.E.2d 1274, 1278-79 (Ind.2008), cert. denied, ___ U.S. ___, 129 S.Ct. 1527, 173 L.Ed.2d 657 (2009) (citation and footnote omitted).]
See id. at 1279, 892 A.2d 646 ("Today, . . . restrictive covenants function identically in planned subdivisions and condominiums and function identically regardless of whether they are found in a master deed or a declaration."); see also Hidden Harbour Estates, Inc. v. Basso, 393 So.2d 637, 638-39 (Fla.Dist.Ct.App.1981); Hidden Harbour Estates, Inc. v. Norman, 309 So.2d 180, 182 (Fla.Dist.Ct.App.1975); Franklin v. Spadafora, 388 Mass. 764, 447 N.E.2d 1244, 1247 (1983); Noble v. Murphy, 34 Mass.App.Ct. 452, 612 N.E.2d 266, 269 (1993); Shorewood W. Condo. Ass'n v. Sadri, 140 Wash.2d 47, 992 P.2d 1008, 1011 (2000).
A servitude is a legal device that creates a right or an obligation that runs with the land or an interest in the land. Restatement (Third) of Property: Servitudes § 1.1(1) (2000); see Perelman v. Casiello, 392 N.J.Super. 412, 418, 920 A.2d 782 (App.Div.2007); Olson v. Jantausch, 44 N.J.Super. 380, 387, 130 A.2d 650 (App. Div.1957) (quoting Coudert v. Sayre, 46 N.J.Eq. 386, 395, 19 A. 190 (Ch.1890)). Covenants are included in the umbrella definition of servitudes. Restatement (Third) of Property: Servitudes § 1.1(2) (2000); see Perelman, supra, 392 N.J.Super. at 418-19, 920 A.2d 782.
New Jersey recognizes the public policy that restraints on the alienation of property are generally disfavored.
It is firmly established that the policy of the law is against the imposition of restrictions upon the use and enjoyment of land and such restrictions are to be strictly construed. Restrictions tend to protect property, but they also impair alienability. Nor will equity aid one man to restrict another in the use of his land unless the right to restrict is made manifest and clear in the restrictive covenant.
[Hammett v. Rosensohn, 46 N.J.Super. 527, 535-36, 135 A.2d 6 (App.Div.1957), aff'd, 26 N.J. 415, 140 A.2d 377 (1958).]
Various factors bear on the reasonableness of a restraint on alienation. Factors tending to support a finding of reasonableness include:
1. the one imposing the restraint has some interest in land which he is seeking to protect by the enforcement of the restraint;
2. the restraint is limited in duration;
3. the enforcement of the restraint accomplishes a worthwhile purpose;

*168 4. the type of conveyances prohibited are ones not likely to be employed to any substantial degree by the one restrained;
5. the number of persons to whom alienation is prohibited is small;
6. the one upon whom the restraint is imposed is a charity.
[Restatement of Property § 406, comment i (1944) (citation omitted); accord Restatement (Third) of Property: Servitudes § 3.4, comment c (2000).]
On the other hand, the following factors tend to support the conclusion that the restraint is unreasonable:
1. the restraint is capricious;
2. the restraint is imposed for spite or malice;
3. the one imposing the restraint has no interest in land that is benefited by the enforcement of the restraint;
4. the restraint is unlimited in duration;
5. the number of persons to whom alienation is prohibited is large.
[Restatement of Property § 406, comment i (1944) (citation omitted); accord Restatement (Third) of Property: Servitudes § 3.4, comment c (2000).]
Keeping these factors in mind, courts must determine whether "a servitude that imposes a direct restraint on alienation of the burdened estate" is unreasonable, and thus, invalid. Restatement (Third) of Property: Servitudes § 3.4 (2000). "Reasonableness is determined by weighing the utility of the restraint against the injurious consequences of enforcing the restraint." Restatement (Third) of Property: Servitudes § 3.4 (2000).
When the property in issue is part of a cooperative or condominium, there is general justification for greater levels of restraint on alienation. Restatement (Third) of Property: Servitudes § 3.4, comment g (2000). Generally, those greater restraints are justified by considerations of the degree of financial interdependence of the owners in a community, as well as the maintenance of shared common areas and recreational and social facilities. Ibid. Nevertheless, the nature of common interest developments may not be sufficient to justify restraints on alienation without the consent of the members, unless the development is small, living quarters are close, and shared responsibilities resemble those of cooperators. Ibid.
In Mulligan, we recognized that some courts have noted a distinction between covenants that were originally recorded, which were "extant at the time of purchase," and "later-adopted ones." Mulligan, supra, 337 N.J.Super. at 302, 766 A.2d 1186 (citing Ridgely Condo. Ass'n, Inc. v. Smyrnioudis, 105 Md.App. 404, 660 A.2d 942, 948 (1995), aff'd, 343 Md. 357, 681 A.2d 494 (1996)). This distinction factored into our decision to apply the reasonableness standard rather than the business judgment rule in that case. Id. at 302-03, 766 A.2d 1186. In Smyrnioudis, the Court of Special Appeals of Maryland stated:
[R]ecorded use restrictions appearing in original condominium documentation deserve a higher degree of deference than those promulgated by a condominium Board of Directors. We emphasize, however, that in the case at hand, we are dealing with a bylaw amendment that was passed many years after appellees bought their units. This is an important difference, because the application of the less restrictive standard is based upon the concept that the unit owners had notice of the recorded use restrictions when they purchased their *169 units. In this case, the notice aspect is lacking.
[Smyrnioudis, supra, 660 A.2d at 949.]
Applying the Restatement of Property factors, the circumstances in this case support a finding of reasonableness. Those imposing the restraint, namely, the Association members, who are the homeowners in the community, clearly possess an interest in the land they are seeking to protect by enforcement of the restraint. The enforcement of the restraint accomplishes a worthwhile purpose by preserving the stable residential character of the community. That character has never before been marked by weekly rentals to vacationers, and the Association members had a rational basis for believing that the peace and tranquility of the community would be disrupted if such rentals were permitted. Leasing to third parties would not likely be employed to a substantial degree by any of the homeowners. This is evidenced by the fact that no homeowner in the history of the community had ever leased his or her home to a third party, and, indeed, some of the homeowners did not even know that leasing was permitted under the original Declaration. Even appellant would be leasing only for the period of time it would take her to sell her home. Thus, the number of persons to whom the alienation is prohibited is small.
The only reasonableness factor not present here is a limit to the duration of the restraint. However, that factor is entitled to very little weight in this case because appellant's intended leasing activities would be of limited duration (until she could sell), and a supermajority of members overwhelmingly favored the restraint without limited duration. Of course, if sentiments change in the future, the amendment could be undone or modified by a supermajority.
Correspondingly, the Restatement of Property factors that would tend to support a conclusion of unreasonableness are not present here (with the same caveat regarding the unlimited duration of the restraint). In particular, the constraint is not capricious. It is founded on a rational basis, a legitimate concern of the Association members, and in accordance with the past practices and customs in the community. Likewise, the restraint was not imposed for spite or malice. There is nothing to suggest any personal animus against appellant, and she has not made any such allegation. The restraint applies equally and uniformly to all homeowners in the community.
Through this analysis, we conclude that in the facts and circumstances of this case, the amendment to the Declaration prohibiting leasing of homes in this community was a reasonable measure.

D.
This brings us to appellant's other contention, namely, that, even if deemed reasonable, the amendment cannot apply to her because it was enacted after she purchased her property. We find no merit in this argument.
Appellant cannot claim a vested and immutable right in one provision of the Declaration, to the exclusion of the applicability of another provision that authorizes amendments to the document. In her appellate brief, appellant concedes that she took title knowing it was subject to the Declaration. ("At the time that title vested in [appellant], the property was subject to the terms and conditions of the Declaration. . . of the [Association], which was executed in 1995 by the original developer.") The Declaration provides that all lots in the community "shall be held, transferred, sold, conveyed, leased and occupied subject to this Declaration and all amendments *170 and supplements thereto." (emphasis added). Appellant's contention that the amended Declaration cannot be enforced against her because it "serves as a restriction in her chain of title" ignores the fact that the property has been and remains bound by the Declaration and its amendments. There is no new restriction on the title, because the restriction has always existed. As long as the amendment is substantively valid, the fact that the amended restriction was not part of the Declaration extant at the time of appellant's purchase is of no consequence.
Affirmed.
NOTES
[1] During the pendency of the litigation, the judge declined to grant interim injunctive relief in favor of the Association, and appellant did lease her home intermittently during that time. At the time of the final judgment, appellant had entered into leases with third parties that were yet to take effect over the next several months. The court implemented the injunctive relief prospectively, so as not to interfere with those leases.
[2] Appellant's brief contains a third point heading, arguing that the Association's actions must be governed by the reasonableness standard, not the business judgment rule. Because the trial court did in fact apply the reasonableness standard, no claim of error is asserted under this point heading. Further, as we will explain in the course of this opinion, we agree with appellant that the reasonableness standard, not the business judgment rule, provides the appropriate basis for judicial review in the context of this case.
[3] Alternatively, a written agreement of at least 67% of the members, acknowledged in the manner required for the execution of a deed, could effect an amendment.
[4] The Declaration required as a prerequisite to a vote by the members, the written approval of at least 51% of "eligible mortgage holders." To be "eligible," mortgage holders were required to request that the Association furnish them with notice of any proposed action by the Association or its members. No mortgage holders availed themselves of this provision, thus rendering it inoperative in this case.
[5] In Mulligan, we held that amendments passed by the membership rather than the Board of Trustees was a factor favoring the reasonableness rule, because the "analytical framework which provides the justification for the business judgment rule is absent." Mulligan, supra, 337 N.J.Super. at 303, 766 A.2d 1186 (citation omitted).
[6] For the sake of completeness, the judge also made findings under the business judgment rule, describing it as a "very high standard for someone who's attacking the action to meet," and noting that a decision or amendment would only "be overturned or subject to some type of judicial action if there's a showing that there was some type of fraud, dishonesty, incompetence or bad faith." The judge found no evidence that the Association acted in that manner, and thus found that the amendment would clearly be sustained under the business judgment rule. We agree with that analysis and determination.