692 A.2d 519

STATE TROOPERS FRATERNAL ASSOCIATION OF NEW JERSEY, INC., A CORPORATION OF THE STATE OF NEW JERSEY, WILLIAM M. SMITH, SCOTT D. FINA, MICHAEL D. COFIELD, DAVID D. MATTEI, DAVID S. GIORDANO, BLANE K. ELMER, STEPHEN M. MAYO, MICHAEL W. FEDERICO, MICHAEL J. DAVIS, DONALD E. MERKER, THERESA M. FOSTER, MICHAEL J. GORE AND DENNIS C. HILBERT, MICHAEL L. FREY, JEFFREY T. LUKAWSKI, BARRY HODGE, RAYMOND LOPEZ, FRANK GARCIA AND WESLEY ROBINSON, PLAINTIFFS-RESPONDENTS, v. THE STATE OF NEW JERSEY, ROBERT J. DEL TUFO, ATTORNEY GENERAL OF NEW JERSEY, NEW JERSEY DIVISION OF STATE POLICE AND JUSTIN J. DINTINO, SUPERINTENDENT OF STATE POLICE, DEFENDANTS-APPELLANTS.

Argued January 6, 1997—Decided April 24, 1997.

40

*Jaynee LaVecchia,* Director, Division of Law, argued the cause for appellants (*Peter G. Verniero,* Attorney General; *Mary C. Jacobson,* Assistant Attorney General, of counsel; *Carol Johnston,* Deputy Attorney General, on the brief).

*Joseph Licata* argued the cause for respondents (*Loccke & Correia*, attorneys).

The opinion of the Court was delivered by

HANDLER, J.

In this case, a group of former state troopers seeks to recover a retroactive pay adjustment under a collective-negotiations agreement that was reached with the State after the troopers had resigned in good standing. The agreement covered a period during which the troopers still had been employed. The former troopers claim that, because of an unwritten past practice of the State Police, the agreement provided for the retroactive pay adjustment, even to troopers who had resigned prior to the actual execution of the agreement. The State, however, asserts that such a pay adjustment is prohibited under a regulation promulgated during the course of the collective negotiations. The regulation generally prohibits retroactive pay increases to all state employees who resign from state employment before the execution of a collective-negotiations agreement.

The major issues posed by this appeal are (1) whether the collective-negotiations agreement incorporated the prior practice of the State Police that authorized retroactive pay adjustments to troopers who had resigned in good standing; (2) whether the regulation denying retroactive pay adjustments constitutes an unfair practice because it effects an impermissible unilateral change of a negotiable term and condition of employment; and (3) if the regulation is otherwise enforceable, whether it can be applied retroactively.

I

The collective-negotiations agreement ("the agreement") under which New Jersey state troopers worked expired on July 1, 1987. When the agreement expired, the State Troopers Fraternal Association ("STFA"), which represents the troopers in employment matters, and the New Jersey Division of State Police ("State

Police") had not yet reached an accord on a successor agreement. While the parties negotiated, the troopers continued to work under the old pay scale. Nearly three years later, on April 26, 1990, the parties arrived at an understanding and duly executed an agreement to cover the period from July 1, 1987 to June 30, 1990. Significantly, the parties predated the agreement as having taken effect on July 1, 1987.

Because of the retroactive effect of the agreement and the fact that the troopers had continued to work under the prior pay scale, the issue of retroactive pay adjustments for the three-year period arose. Article X of the agreement stated that "[a]ll salary adjustments will be made consistent with the provisions, practices and policies of the State and in accordance with the State Compensation Plan effective at the time." The unwritten practice of the State Police as of July 1, 1987 (actually, since 1970) had been to provide retroactive pay adjustments not only to current troopers, but to troopers who had died, retired, or resigned in good standing during the adjustment period.

Implementation of the unwritten State Police practice of allowing retroactive pay under Article X of the agreement was complicated by the promulgation of a statewide regulation on September 6, 1988 (during collective negotiations), *N.J.A.C.* 4A:3-4.20, that governed retroactive pay adjustments. That regulation, issued by the Department of Personnel ("DOP"), authorized retroactive pay adjustments only for current employees and employees who had retired during the adjustment period, and, by a subsequent amendment, 25 *N.J.R.* 4064(a) (Sept. 7, 1993); 25 *N.J.R.* 1916(a) (May 17, 1993), for employees who had died during the adjustment period. Thus, state employees who resigned, even in good standing, would no longer be eligible for retroactive pay adjustments under the regulation.

Between July 3, 1987 and October 20, 1989, nineteen troopers resigned from the force in good standing. After the agreement was executed in 1990, these former troopers requested the retroactive pay adjustment for the covered period during which they

had worked. They did so because troopers who had retired or died during the period, as well as those still on the force, had received the pay adjustment. The State, citing the regulation, refused the request. On July 1, 1993, the troopers, through the STFA, brought suit in the Law Division against the State, the Attorney General, the State Police, and the State Police Superintendent (referred to collectively as "the State"). They alleged that, by enacting the regulation, the State had breached the agreement [1] and that the regulation violated the equal-protection guarantees of the United States and New Jersey Constitutions.

The State moved to dismiss both counts. It argued that the agreement's provision for binding arbitration deprived the Law Division of subject-matter jurisdiction over the breach-of-contract claim. Regarding the constitutional claim, it asserted that plaintiffs had not exhausted their administrative remedies, because they had failed to appeal the denial of their requests to the Administrative Section of the State Police. Moreover, the State argued that even if plaintiffs had exhausted their administrative remedies, jurisdiction to review the administrative determination reposed in the Appellate Division, not the Law Division.

The Law Division agreed with the State and consequently dismissed the contract claim. It also transferred the constitutional claim to the Appellate Division, reasoning that to transfer the claim to the DOP for administrative resolution would result in dismissal for lateness in filing, thus undermining the interests of justice.

The Appellate Division subsequently granted plaintiffs' motion to file a Notice of Appeal *nunc pro tunc* regarding the dismissal of

---

[1] Originally, the breach-of-contract claim was divided into two counts, one covering 18 troopers and one covering a nineteenth trooper who was erroneously asserted to have resigned after the agreement had expired in 1990 (i.e., under the agreement covering July 1, 1990 to June 30, 1993). However, in the Appellate Division, the error was corrected, and the court consolidated the two counts. For the sake of simplicity, we will treat the two counts as having been merged from the outset of the lawsuit.

the contract claim and then consolidated that claim with the transferred constitutional claim. After a remand to the trial court for findings concerning the prior practice of the State Police in awarding retroactive pay adjustments, the Appellate Division, in an unpublished opinion, concluded that the State Police had followed a practice of providing such payments and that the practice had been incorporated into the agreement. It then reasoned that the resulting contractual term was a "vested right" that the State could not abrogate retroactively by invoking the regulation prohibiting retroactive pay adjustments. Accordingly, it ordered that the State provide the troopers with backpay. The court did not reach the equal-protection claim and, because all factual issues had been resolved, declined to require the parties to resort to binding arbitration.

We granted the State's petition for certification. 145 *N.J.* 373, 678 *A*.2d 714 (1996).

## II

We initially must determine whether the agreement provides the former troopers with a retroactive pay adjustment. As noted, the agreement states that "[a]ll salary adjustments will be made consistent with the provisions, practices and policies of the State and in accordance with the State Compensation Plan effective at the time." Understanding the content and effect of that provision turns on the meaning of the phrases "provisions, practices and policies" and "at the time." In our undertaking of this interpretive task, fundamental canons of contract construction require that we examine the plain language of the contract and the parties' intent, as evidenced by the contract's purpose and surrounding circumstances. *Marchak v. Claridge Commons, Inc.*, 134 *N.J.* 275, 282, 633 *A*.2d 531 (1993); *Atlantic Northern Airlines, Inc. v. Schwimmer*, 12 *N.J.* 293, 303, 96 *A*.2d 652 (1953).

In considering the intended meaning of the term "provisions, practices and policies," the trial court, after a remand hearing ordered by the Appellate Division, found as a matter of fact that

the State Police, since 1970, had provided the retroactive pay adjustments to state troopers who had resigned in good standing prior to the formal adoption of salary increases. Because of our traditional deference to trial-level factual findings, we perceive no reason to disturb the trial court's determination in this regard, as confirmed by the Appellate Division. *See Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974).

■ Interpretation of the phrase, "at the time" presents a more difficult task, because its definition is not revealed by the history or circumstances surrounding the negotiations. If we interpret the agreement from the perspective of its effective date, July 1, 1987, then the contract incorporates the prior practice of the State Police of awarding backpay to former troopers who resigned in good standing. If, however, we view the contract from the date of execution, April 26, 1990, then the contract incorporates the statewide regulation that denies backpay under these circumstances.

An examination of the terms of the agreement persuades us that the relevant "provisions, practices and policies" are those that were in existence on the effective date of the agreement, namely, July 1, 1987, despite the fact that the agreement was not actually executed until 1990. The express application of the contract terms to the period beginning July 1, 1987 and the express inclusion of that date as the contracting date, implies a mutual intent that the agreement be deemed as having been signed on that date.

This construction is in accord with interpretations by other courts that have considered the issue of the effective date of a contract when that date differs from the date of execution. In *Springer v. Powder Power Tool Corp.,* 220 *Or.* 102, 348 *P.*2d 1112 (1960), the parties executed a collective-bargaining agreement on August 24, 1953 with an effective date of April 1, 1953. Employees still on payroll as of August 24 received retroactive pay increases under the agreement, but the employer refused to provide the adjustment to three employees who had resigned during the period between April 1 and August 24. *Id.* 348 *P.*2d at

1113. The Supreme Court of Oregon held that the three employees were entitled to the adjustment:

[The language of the agreement] is clear and free from ambiguity. Since the parties have agreed that the contract should be effective as of April 1, 1953, we are bound to construe it as if it were made on that date. If it had been entered into on April 1, 1953 [the employees] without question would have been entitled to pay at the new rate for they were then employees of the company. By providing that the contract should be retroactive to that date, the same result was accomplished and employees for whose benefit this action is brought are entitled to the retroactive pay.

[*Id.* at 1116.]

*See also Barclay v. City of Spokane,* 83 *Wash.*2d 698, 521 *P.*2d 937, 938–39 (1974) (en banc) (citing *Springer* and reaching same conclusion).

■ Despite our determination that the date specified in the contract itself is the better indicator of the parties' intent, we decline to formulate a general rule, as did the Supreme Courts of Oregon and Washington, that, in cases of predated contracts, the specified contract date invariably governs. The determination of which date controls the application of the contract must be derived from the intent of the parties, and if no subjective intent is apparent or ascertainable, that intent must be based on the objective language of the contract.

In this case, the evidence of the parties' subjective intent is tenuous. A July 14, 1989 letter from the STFA President to the State Police suggests that the parties were aware of the change in the award of backpay under the regulation well before the execution of the agreement in 1990. It is readily inferable that the parties' apparent knowledge of the new regulation informed their understanding when they agreed to make an express reference in the contract to the existing "provisions, practices and policies." Those "practices" related to the identical subject matter of the regulation. Consequently, the limitation of "provisions, practices and policies" to those existing "at the time" created a genuine ambiguity about whether the parties shared a subjective intent concerning the effect of the regulation. Because it is difficult to extrapolate from the background and surrounding circumstances a

mutual subjective understanding regarding the intended meaning of the phrase "at the time," the language of the agreement itself must control. We thus look to the date on the agreement, July 1, 1987, and conclude that the relevant salary-adjustment practice must be governed by that date.

■ We hold that the practice in effect on July 1, 1987 of making retroactive pay adjustments to troopers who had resigned in good standing was incorporated into the agreement as an implied term. A practice need not be formalized to become an implied term of a contract. Instead, "[t]he actual conduct and practical understanding of the parties exhibited in the performance of a contract may color its interpretation." *Medivox Productions, Inc. v. Hoffmann–LaRoche, Inc.*, 107 *N.J.Super.* 47, 60–61, 256 *A.*2d 803 (Law Div.1969) (citing *Michaels v. Brookchester, Inc.*, 26 *N.J.* 379, 140 *A.*2d 199 (1958)). The practice of the State Police since 1970 of making this type of retroactive pay adjustment certainly qualifies as sufficiently longstanding and consistent to be incorporated into the agreement. The agreement, as of its effective date of July 1, 1987, thus required retroactive salary payments to troopers who had resigned in good standing.

## III

■ The major issue that remains is the effect of the regulation, which was promulgated on September 6, 1988, on the implied provision of the agreement that entitles troopers who had resigned in good standing to retroactive pay adjustments. That issue requires that we determine whether the regulation may be enforced under the Employer–Employee Relations Act and, if so, whether it may be applied retroactively.

## A.

■ Under the Employer–Employee Relations Act ("the Act"), *N.J.S.A.* 34:13A–1 to –29, collective negotiations with public employees over terms and conditions of employment encompass a

broad variety of subjects, *N.J.S.A.* 34:13A–5.3, including compensation. *In re IFPTE, Local 195 v. State,* 88 *N.J.* 393, 403, 443 *A.2d* 187 (1982). However, the Act generally precludes negotiation about matters that are dictated by statute or regulation. As we have stated,

> specific statutes or regulations which expressly set particular terms and conditions of employment ... for public employees may not be contravened by negotiated agreement. For that reason, negotiation over matters so set by statutes or regulations is not permissible. We use the word "set" to refer to statutory or regulatory provisions which speak in the imperative and leave nothing to the discretion of the public employer. All such statutes and regulations which are applicable to the employees who compromise a particular unit are effectively incorporated by reference as terms of any collective agreement covering that unit.
>
> [*State v. State Supervisory Employees Ass'n,* 78 *N.J.* 54, 80, 393 *A.2d* 233 (1978).]

*See also Township of West Windsor v. Public Employment Relations Comm'n,* 78 *N.J.* 98, 116, 393 *A.2d* 255 (1978) (same). Thus, if a statute or regulation "speak[s] in the imperative" regarding a particular term of employment, it effectively preempts negotiation over that term, and is itself deemed to be incorporated into the employment agreement.

 An important exception to this general rule of preemption is that a regulation does not necessarily preempt negotiation when the regulation is promulgated by an agency that itself is a party to the collective negotiations. *Council of State College Locals v. State Bd. of Higher Educ.,* 91 *N.J.* 18, 28–29, 449 *A.2d* 1244 (1982). This exception is rooted in the Act, which states that "[p]roposed new rules or modifications of existing rules governing working conditions shall be negotiated with the majority representative before they are established." *N.J.S.A.* 34:13A–5.3. This statutory prescription "prohibit[s] an employer from unilaterally altering the status quo concerning mandatory bargaining topics, whether established by [an] expired contract or by past practice, without first bargaining to an impasse." *Board of Educ. v. Neptune Twp. Educ. Ass'n,* 144 *N.J.* 16, 22, 675 *A.2d* 611 (1996) (quoting Stephen F. Befort, *Public Sector Bargaining: Fiscal Crisis and Unilateral Change,* 69 *Minn.L.Rev.* 1221, 1268 (1985)). The prohibition against unilateral changes encompasses a variety of terms and conditions of employment, including compensation,

*Galloway Tp. Bd. of Educ. v. Galloway Tp. Educ. Ass'n,* 78 *N.J.*
25, 47–52, 393 *A.*2d 218 (1978), length of work day, *In re Maywood
Bd. of Educ.,* 168 *N.J.Super.* 45, 58–59, 401 *A.*2d 711 (App.Div.),
*certif. denied,* 81 *N.J.* 292, 405 *A.*2d 836 (1979), and length of work
year. *Board of Educ. v. Piscataway Twp. Principals Assoc.,* 164
*N.J.Super.* 98, 100–01, 395 *A.*2d 880 (App.Div.1978).

The exception to the generally preemptive effect of regulations
is predicated on the paramount statutory policy that prohibits
unfair labor practices, including unilateral changes in the terms
and conditions of employment. We have noted that "[w]hen an
agency performs dual roles as both regulator and employer, the
possibility exists that the agency could use its preemptive regula-
tory power in an abusive or arbitrary manner to insulate itself
from negotiations with its employees." *Council of State College
Locals, supra,* 91 *N.J.* at 27, 449 *A.*2d 1244.

 Nevertheless, the exception applicable to agency regula-
tions that purport to effect unilateral changes in terms and
conditions of employment where the agency is also a negotiating
party does not invariably preclude preemption. Instead, a qualifi-
cation exists that derives from the regulatory responsibilities of a
government agency in carrying out its public mandate, a responsi-
bility that is nondelegable and that may not be subordinated to the
agency's role in negotiating terms and conditions of employment.
*See id.* at 28, 449 *A.*2d 1244. In other words, an agency may not
be precluded from fulfilling its statutory mission in good faith
simply because the agency happens to be in the course of collec-
tive negotiations. Consequently, when a negotiating agency itself
issues a regulation that otherwise would override negotiations, the
agency's good faith—and hence preemption—is still presumed.
However, the preemptive effect on negotiations can be overcome
by a showing that the regulation was not designed to fulfill the
agency's statutory mandate, but rather was "arbitrary, adopted in
bad faith, or passed primarily to avoid negotiation on terms and
conditions of employment." *Ibid.*

In this case, the regulation clearly encompasses the negotiated
term, as incorporated through the existing State Police practice,

concerning retroactive pay to employees who have resigned in good standing. The regulation denies retroactive pay adjustments except for specifically enumerated former employees, a category that does not include those whose termination occurred through resignation. However, the agreement incorporating the practice of the State Police authorizes such payments. Hence, unless the regulation constitutes an impermissible unilateral change or unfair practice, it preempts the prior practice of the State Police, as embodied in the agreement.

We conclude that because the regulation was not issued by the State Police (the negotiating agency), it is not an impermissible unilateral change or an unfair practice. The regulation was issued by the DOP, which intended to prescribe a rule governing retroactive pay to all state employees. The DOP, unlike the State Police, was not involved in the collective negotiations with this specific group of employees. *See id.* at 23, 449 *A.*2d 1244 (noting distinction between promulgation of a regulation by an agency with jurisdiction over all state employees and by an agency with jurisdiction over a specific group of employees with which it must negotiate). We note that even if the DOP were deemed to have been involved in the negotiations, the exception still would not apply because there is no indication of bad faith in the adoption of the regulation. *Id.* at 28, 449 *A.*2d 1244. The DOP was simply fulfilling its statutory role and was apparently unaware of the State Police's prior practice, an unawareness evidenced by its statement that "[t]he provisions of this rule reflect long-standing current practice." 20 *N.J.R.* 2259 (Sept. 6, 1988).

Because of the mandatory language of the regulation and the absence of evidence of bad faith or arbitrary conduct on the part of the DOP, the regulation under the Act preempts the implied contract term if it can be applied retroactively.

### B.

The applicability of the regulation's preemptive power to the salary adjustments of the former troopers entails a determina-

tion of the DOP's intent to apply the regulation retroactively and, if such an intent exists, an evaluation of whether the DOP has the power to apply the regulation retroactively in this case. The Appellate Division held that the inclusion of the prior practice in the agreement constituted a "vested right" that the State could not abrogate retroactively through its regulation, despite its statutory authority to preempt collective negotiations under its general rulemaking powers.

In analyzing whether a statute or regulation may apply retroactively, a court must determine, first, whether the Legislature or agency intended that the statute or regulation apply retroactively, and, if so, whether retroactive application would work either a manifest injustice or an unconstitutional interference with a vested right. *Twiss v. State*, 124 *N.J.* 461, 467, 591 *A.*2d 913 (1991). Whereas interference with a vested right implicates due-process concerns, *id.* at 469–70, 591 *A.*2d 913, manifest-injustice analysis is a nonconstitutional, equitable doctrine designed to prevent unfair results that do not necessarily violate any constitutional provision. *Phillips v. Curiale*, 128 *N.J.* 608, 625, 608 *A.*2d 895 (1992).

In this case, we believe that the DOP intended that the regulation apply retroactively. Although the agency never explicitly stated such an intent, it issued the regulation with the understanding that "[t]he provisions of this rule reflect long-standing current practice" and that "[t]hey also address the administrative and record-keeping problems with retroactive pay transactions involving separated employees." 20 *N.J.R.* 2259 (Sept. 6, 1988). Although the denial of retroactive pay adjustments to former employees who had resigned in good standing was not "long-standing current practice" for the State Police, the DOP apparently was unaware of that fact and clearly believed, in promulgating a regulation to deny retroactive pay to such employees, that it simply was codifying existing statewide practice. That understanding is consistent with an intent to implement the regulation retroactively. Moreover, the agency's concern about administra-

tive and record-keeping issues further supports the inference of a retroactive intent because such problems would linger for a substantial period of time if the regulation were only prospective. In any event, although the record is not entirely clear, we believe that the DOP intended that the regulation operate retroactively.

■ Because we have concluded that the regulation was intended to apply retroactively, we must address whether retroactive application would work a manifest injustice or interfere with a vested right. *Twiss, supra*, 124 *N.J.* at 467, 591 *A.*2d 913. As we have noted, the manifest-injustice doctrine is a nonconstitutional, equitable doctrine that allows courts to avoid an unfair result even where a constitutional vested right may not be at stake. *Phillips, supra*, 128 *N.J.* at 625, 608 *A.*2d 895; *State v. Ventron Corp.*, 94 *N.J.* 473, 498, 468 *A.*2d 150 (1983). In describing manifest-injustice analysis, we have stated that

[t]he essence of this inquiry is whether the affected party relied, to his or her prejudice, on the law that is now to be changed as a result of the retroactive application of the statute, and whether the consequences of this reliance are so deleterious and irrevocable that it would be unfair to apply the statute retroactively.

[*Gibbons v. Gibbons*, 86 *N.J.* 515, 523–24, 432 *A.*2d 80 (1981).]

Relevant to the inquiry of whether the regulation's retroactive application would work a manifest injustice in this case is the potential reliance that the former troopers, in deciding whether to resign, placed on the past practice of the State Police. The regulation was promulgated on September 6, 1988, which was during the negotiations over the agreement and within the period that the agreement was intended to cover. Between the beginning of the period covered by the agreement (July 1, 1987) and that date, the troopers who resigned had no reason to believe that the past practice would not apply to them should they leave the force before the consummation of a new agreement. These troopers clearly may have relied on the continuation of the past practice when they decided to resign before the new agreement was signed.

██ Once the regulation was issued, however, the reasonableness of any reliance on the applicability of the past practice was greatly diminished. At that point, any troopers contemplating whether to resign could not reasonably have assumed that the new agreement, when signed, would contradict the new regulation by including retroactive pay for troopers who had resigned in good standing. The regulation certainly should have given them pause. We note that the STFA was aware of the regulation, as evidenced by a July 14, 1989 letter from the STFA president threatening litigation over the issue. Although it may appear unfair to impute the STFA's knowledge to the individual troopers, the STFA was their authorized representative, and we must presume that the troopers were aware of the terms of their employment, or should be charged with knowledge thereof, especially as those terms related to the consequences of resignation from the force.

We therefore determine that the twelve troopers who resigned between July 1, 1987 and September 6, 1988 are entitled to the retroactive pay adjustment, in spite of the DOP's preemptive power, because of the reasonable reliance that they may have placed on the continued existence of the State Police practice. Because of their reasonable reliance and resulting change in position, to deny them the adjustment would work a manifest injustice. Conversely, we conclude that the seven troopers who resigned after September 6, 1988 are not entitled to the adjustment under manifest-injustice analysis, because, given the existence of the regulation, they could not reasonably have relied on the continuation of the old practice.

██ Because we conclude that denial of the adjustment to the seven troopers who resigned after the promulgation of the regulation would not work a manifest injustice, we must determine whether the denial would violate a constitutionally protected vested right of these troopers. Under vested-rights analysis, we examine whether the asserted interest is "a present fixed interest which ... should be protected against arbitrary state action," *Phillips, supra,* 128 *N.J.* at 620, 608 *A.*2d 895 (quoting *Pennsylva-*

*nia Greyhound Lines, Inc., supra,* 14 *N.J.* at 384, 102 *A.*2d 587), focusing on the "nature of the altered right." *Id.* at 622, 608 *A.*2d 895. In this case, we already have determined that the past practice of the State Police of providing retroactive pay adjustments is contractual in nature. *Supra* at 47–50, 692 *A.*2d at 523–25. Contractual interests clearly may qualify as vested rights. *United States Trust Co. v. New Jersey,* 431 *U.S.* 1, 19 n. 16, 97 *S.Ct.* 1505, 1516 n. 16, 52 *L.Ed.*2d 92, 108 n. 16 (1977); *Perry v. Sindermann,* 408 *U.S.* 593, 601–02, 92 *S.Ct.* 2694, 2699–2700, 33 *L.Ed.*2d 570, 580 (1972).

■■■ In determining the permissible extent of intrusion on an otherwise-protected right or interest, we balance the public interest in the legislation or regulation against the individual interest. In doing so, we recognize the considerable flexibility that the State must have in determining how best to govern:

A state may, in the exercise of the police power, enact a statute to promote the public health, safety, morals or general welfare. Such a statute, because of retroactive application or otherwise, may diminish in value or totally destroy an individual's right, whether in property as such or arising out of contract, provided that the public interest to be promoted sufficiently outweighs in importance the private right which is impaired.

[*Rothman v. Rothman,* 65 *N.J.* 219, 225–26, 320 *A.*2d 496 (1974) (citing United States Supreme Court cases).]

*Cf. United States Trust Co., supra,* 431 *U.S.* at 22, 97 *S.Ct.* at 1517, 52 *L.Ed.*2d at 109 ("The States must possess broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result.").

The private interest here is the receipt of a retroactive pay adjustment, whereas the public interest is the State's control over governmental expenditures and its responsibility for the public fisc. Although the troopers have a reasonable interest in receipt of the pay adjustment, the State's important interests in safeguarding revenues, assuring statewide uniformity in compensation practices, and maintaining control of the public budgetary process impel us to conclude that the private interest of the troopers is not vested in the constitutional sense and that the State may impair it retroactively. If the contractual interest at stake here were to be

classified as a fixed due-process right, the State potentially could be subject to a flurry of claims by public employees for each employment regulation that it enacted, resulting in a significant reduction in its ability to administer state employment practices uniformly and to conserve the public's scarce resources. We decline to impose such a rigid obligation on the State.[2] *See Ratanasen v. California Dep't of Health Servs.*, 11 *F.*3d 1467, 1471 (9th Cir.1993) ("Public officials are responsible for overseeing the expenditure of our increasingly scarce public resources[,] and we must give them appropriate tools to carry out that charge."). We thus conclude that the contractual interest at stake is not a vested right and that the regulation preempts the contractual term with respect to the seven troopers who resigned after the issuance of the regulation.

## IV

Accordingly, we affirm the judgment of the Appellate Division insofar as it awarded the retroactive salary adjustment to the troopers who resigned in good standing prior to the promulgation of the regulation. However, we reverse that portion of the judgment awarding the adjustment to the troopers who resigned subsequent to that date.

Chief Justice PORITZ and Justices POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN join in Justice HANDLER's opinion.

---

[2] An additional factor supporting the view that the State's interest outweighs that of the former troopers is that the promulgation of the regulation did not evince a motivation by the State to avoid its own contractual obligations. *Cf. Energy Reserves Group, Inc. v. Kansas Power and Light Co.*, 459 *U.S.* 400, 412–13 & n. 14, 103 *S.Ct.* 697, 705 & n. 14, 74 *L.Ed.*2d 569, 581 & n. 14 (1983) (in the context of the Contract Clause, stating that state action impairing a contract to which the state is a party is subject to heightened scrutiny because of the possibility that the state is motivated by self-interest instead of the public interest). As we noted previously, the DOP enacted the regulation without knowledge of the State Police practice of awarding this type of pay adjustment to troopers who resigned in good standing. *Supra* at 53, 692 *A.*2d at 526.