NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2859-20

FULTON BANK OF NEW
JERSEY,

    Plaintiff-Appellant,

v.

CASA ELEGANZA, LLC,
ANDREW P. KLOSE and
STATE OF NEW JERSEY,

    Defendants,

and

IRON GATE AT GALLOWAY
HOA and IRON GATE AT
GALLOWAY, INC.,

    Defendants-Respondents.

_____

APPROVED FOR PUBLICATION

August 11, 2022

APPELLATE DIVISION

> Submitted March 24, 2022 – Decided August 11, 2022
>
> Before Judges Alvarez, Mawla and Mitterhoff.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Atlantic County, Docket No. F-000615-18.
>
> Eisenberg, Gold & Agrawal, PC, attorneys for appellant (Douglas J. Ferguson, on the briefs).

Christopher J. Stanchina, attorney for respondents.

The opinion of the court was delivered by

ALVAREZ, P.J.A.D. (retired and temporarily assigned on recall)

Plaintiff Fulton Bank of New Jersey (the Bank) acquired title at a sheriff's sale after mortgage foreclosure to a portion of a residential community subject to defendant Iron Gate at Galloway Homeowners' Association (HOA) Declaration of Covenants. The developer recorded the HOA's Declaration of Covenants on June 25, 2007, after the Bank's first mortgage was recorded, and in accord with Galloway Township's major subdivision approval.

The Bank later sold the property to Gargione LLC. At closing, the HOA billed the Bank for $12,651.35 attributed to the period the Bank held title. The Bank refused to pay, and the funds were escrowed. The Bank then filed a motion under the foreclosure docket number in Chancery to "divest" the land from the HOA Covenants and vacate the fees.

The Bank contends that because the first mortgage was recorded before the HOA Declaration, the foreclosure extinguished the obligations. We affirm the Chancery judge's June 7, 2021 denial of the motions, finding the HOA Declaration constituted an equitable servitude that follows the land even if the mortgage was filed first.

A-2859-20

Defendant Casa Eleganza, LLC (Casa), initially prepared the major subdivision approval granted by Galloway Township on "Iron Gate at Galloway," on October 23, 2006, revised it on February 14, 2007, and filed it on June 25, 2007. The HOA was responsible for maintaining the private road in the development, designated as Block 1260.01, Lot 15.01, along with open space designated as Lot 15.13. In addition, the HOA was responsible for drainage facilities, related buffer areas, and signage. If the HOA failed to perform, the municipality would take over and charge costs back to individual owners on a pro rata basis.

Certain architectural restrictions and easements for the maintenance of the community systems were also included. Article 4 of the Declaration requires every property owner in the community "to have a membership" in the HOA. It further states that "[m]embership shall be appurtenant to and may not be separated from ownership of any Lot or Dwelling," and that "[i]n the event that fee title to a Lot or Dwelling is transferred or otherwise conveyed, the membership in the Association which is appurtenant thereto shall automatically pass to such transferee."

Article 9 of the Declaration pertains to assessments. Section 9.1 states that "assessments for Common Expenses provided for herein shall be used for the general purposes of promoting the health, safety, welfare, common benefit,

and enjoyment of the Owners and Occupants of the Development, and maintaining the Development and improvements therein[.]"  Section 9.2, titled "Creation of Lien and Personal Obligation of Assessments[,]" provides in relevant part:

> Each Owner of a Lot or Dwelling, by acceptance of a deed or other conveyance thereof, whether or not it shall be so expressed in such deed or conveyance, is deemed to covenant and agree to pay to the Association:  (a) annual assessments . . . ; and (b) special assessments . . . ; and (c) individual or specific assessments . . . , and (d) emergency assessments . . . . Any such assessments together with late charges, interest at the rate of ten . . . percent per annum compounded annually, and court costs and attorney's fees incurred to enforce or collect such assessments, shall be an equitable charge and a continuing lien upon the Lot or Dwelling, the Owner of which is responsible for payment.  Each Owner shall be personally liable for assessments coming due while he is the Owner of the Lot or Dwelling, and his grantee shall take title to such Lot or Dwelling subject to the equitable charge and continuing lien thereof, but without prejudice to the rights of such grantee to recover from his grantor any amounts paid by such grantee thereof; provided, however, the lien for unpaid assessments attributable to the time prior to the foreclosure, sale or a conveyance by deed in lieu of foreclosure shall not apply to the holder of any first priority institutional Mortgage or to the holder of any Mortgage securing a loan made by Declarant, its affiliates, successors, or assigns.

Additionally, Section 9.8, titled "Effect of Nonpayment; Remedies of the Association" states, in pertinent part:

4

> The equitable charge and lien provided for in this Article shall be in favor of the Association, and each Owner, by his acceptance of a deed or other conveyance to a Lot or Dwelling, vests in the Association and its agents the right and power to bring all actions against him/her personally for the collection of such assessments as a debt and/or to foreclose the aforesaid lien in the same manner as other liens for the improvements of real property.

Furthermore, Section 9.11, titled "Initial Assessments and Capital Contribution," states:

> Declarant covenants to require the transferee of each Lot and/or Dwelling on the day on which such Lot or Dwelling is conveyed to a person other than Declarant to contribute as a non-refundable capital contribution to the Association the sum of Five Hundred Dollars . . . , or other such sum that Declarant determines is reasonable and required, except that such amended sum must be applied uniformly to all [eight] Owners. Upon the purchase of a Lot from the Declarant, the portion of the then current Annual Assessment to be paid by the transferee of any such Lot or Dwelling shall be prorated at the Closing.

Per the HOA's letter dated March 15, 2021, the $12,651.35 bill was for: (1) capital contributions; (2) HOA and legal fees from April 1, 2019, through March 31, 2021; and (3) an unpaid landscaping bill for services that the Bank had authorized.

The original mortgagee lent $646,000 to the developer in a mortgage recorded June 8, 2007. Two additional mortgages for $386,666.40 and

5

$11,972.40 were recorded on August 3, 2007. Upon foreclosure, the sheriff's deed to the Bank included Block 1260.01, Lots 15.01, 15.07, 15.09, 15.10, 15.11, and "15.13 [f/k/a] 15.01."

Schedule A of the sheriff's deed excepts from the conveyance the right of ingress and egress over the "premises known as Lot 15.01 in Block 1260.01 and commonly known as Gate House Drive, a private road[.]" The sheriff's deed did not include all the lots originally secured by the mortgage loans, as third parties had purchased three of those lots over the years. Those owners were not named as defendants, did not intervene in the litigation, and did not participate in this appeal.

Casa, the developer, conveyed Lots 15.01 and 15.13 to the HOA. The foreclosure complaint did not refer to the Declaration of Covenants; however, it joined the HOA and developer as defendants, presumably because the HOA was the record owner of a portion of the mortgaged property. In the prayer for relief included in the foreclosure complaint, the Bank only sought judgment "[b]arring and foreclosing the [d]efendant(s), and each of them, of all equity of redemption in and to the said lands and premises."

Judge Michael Blee denied the Bank's motion despite the sequence of recordation, finding neither the charges nor the Declaration extinguished. He concluded the equities weighed against the Bank's application because the

A-2859-20

HOA and the covenants were a condition of the subdivision approval. Furthermore, the other individual homeowners in the development relied upon the existence of the HOA and the Declaration of Covenants when they purchased their homes and would suffer great prejudice were they voided.[1] The other homeowners "would be stuck with the cost of a private road moving forward and all of the . . . basins and not be able to enforce the architectural mandate that they relied upon when purchasing." Therefore, the judge directed that the fees held in escrow be paid to the HOA.

The judge found that prior to foreclosure, the Bank knew that the subdivision approval required the HOA to assume responsibility for maintaining the common areas, including a drainage basin and private road. The Bank was also on notice that there were unpaid assessments.

During oral argument, the Bank's attorney asked the judge whether the sheriff's sale divested the HOA's interest because the initial mortgage was first in time. The judge responded, "[n]ot in this circumstance, no." He added: "the equities in this case balance more in favor of the defendant [inasmuch] as this was a planned development approved by the Galloway Township Planning Board. Its HOA association clearly was a condition of that."

---

[1] Although Gargione was served with the Bank's application, he did not appear during the argument or participate in the appeal.

When the Bank's attorney questioned the judge's decision because the sheriff's deed included the lots that had been conveyed to the HOA, the judge said that if there were issues with title, "there may have to be a corrected deed." The judge further stated: "it's up to [Gargione] to work something out. I'm presuming the HOA's going to start assessing them moving forward since the time of the purchase."

On appeal, the Bank alleges the following error:

> POINT I
>
> THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING APPELLANT'S MOTION TO DIVEST.
>
> > A. A PURCHASER AT FORECLOSURE SALE ACQUIRES THE ENTIRE INTEREST OF THE MORTGAGOR AND MORTGAGEE UNAFFECTED BY THE RIGHTS OF JUNIOR MORTGAGEES OR ENCUMBRANCERS MADE PARTY TO THE FORECLOSURE.

We review a trial court's application of an equitable doctrine for abuse of discretion. See N.Y. Mortg. Tr. 2005-3 Mortg.-Backed Notes, U.S. Bank Nat'l Ass'n as Tr. v. Deely, 466 N.J. Super. 387, 397 (App. Div. 2021). Under this standard, we do not reverse "in the absence of a clear abuse of discretion." Ibid. (quoting Ocwen Loan Servs., LLC v. Quinn, 450 N.J. Super. 393, 397 (App. Div. 2016)).

Common interest communities, such as Iron Gate at Galloway, are "distinguishable from any other form of real property ownership because 'there is a commonality of interest, an interdependence directly tied to the use, enjoyment, and ownership of property.'" Comm. for a Better Twin Rivers v. Twin Rivers Homeowners' Ass'n, 192 N.J. 344, 365 (2007) (quoting Fox v. Kings Grant Maint. Ass'n, 167 N.J. 208, 222 (2001)). "One of the core foundations of a common interest community is a sharing of expenses for maintenance among the residents." Mulligan v. Panther Valley Prop. Owners Ass'n, 337 N.J. Super. 293, 311 (App. Div. 2001).

The Restatement (Third) of Property: Servitudes defines a common interest community as:

> a real-estate development or neighborhood in which individually owned lots or units are burdened by a servitude that imposes an obligation that cannot be avoided by nonuse or withdrawal
>
> > (1) to pay for the use of, or contribute to the maintenance of, property held or enjoyed in common by the individual owners, or
> >
> > (2) to pay dues or assessments to an association that provides services or facilities to the common property or to the individually owned property, or that enforces other servitudes burdening the property in the development or neighborhood.
>
> [Restatement (Third) of Property: Servitudes § 1.8 (Am. Law Inst. 2000).]

"A servitude is a legal device that creates a right or an obligation that runs with the land or an interest in the land." Cape May Harbor Vill. & Yacht Club Ass'n v. Sbraga, 421 N.J. Super. 56, 71 (App. Div. 2011) (citing Restatement (Third) of Property: Servitudes § 1.1(1) (Am. Law Inst. 2000)). "Covenants are included in the umbrella definition of servitudes." Ibid. (citing Restatement (Third) of Property: Servitudes §1.1(2) (Am. Law Inst. 2000)).

"Most common-interest communities are created by a declaration, which not only imposes the servitudes, but also provides automatic and mandatory membership in an association of property owners." Restatement (Third) of Property: Servitudes § 1.8 cmt. c (Am. Law Inst. 2000). Accordingly, property owners in common interest communities "take title subject to a master deed or declaration[.]" Cape May Harbor Vill., 421 N.J. Super. at 70.

The declaration of covenants "include[s] restrictions and conditions that run with the land and bind all current and future property owners." Highland Lakes Country Club & Cmty. Ass'n v. Franzino, 186 N.J. 99, 110 (2006). Declarations are recordable interests and "from the time of recording," serve as "notice to all subsequent purchasers, mortgagees and judgment creditors of the execution of the document recorded and its contents." N.J.S.A. 46:26A-12(a).

As noted, the declaration may also create a homeowners' association. Highland Lakes, 186 N.J. at 110. "The association performs many functions,

but '[p]erhaps its most important responsibilities are enforcement of the covenants agreed to by community members.'" Fox, 167 N.J. at 223 (alteration in original) (quoting David C. Drewes, Note, Putting the "Community" Back Into Common Interest Communities: A Proposal For Participation-Enhancing Procedural Review, 101 Colum. L. Rev. 314, 350 n.9 (2001)).

The Bank disputes the charged assessments. When interpreting the Declaration, however, "fundamental canons of contract construction require [the court to] examine the plain language of the contract and the parties' intent, as evidenced by the contract's purpose and surrounding circumstances." Highland Lakes, 186 N.J. at 115 (quoting State Troopers Fraternal Ass'n v. State, 149 N.J. 38, 47 (1997)).

In Highland Lakes, the Court found that the properties in a common interest community were "subject to an equitable servitude in respect of arrears accrued by prior owners" based upon the plain language of the binding covenants contained within the community's recorded deeds and bylaws. Id. at 103. The mortgage was recorded after the HOA's declaration, but the homeowner contended that the mortgage foreclosure proceeding, which preceded his acquisition of ownership, discharged the lien. Ibid.

The homeowners' association took the position that arrears on membership charges accrued by predecessors in title could "be enforced both

11

as a contractual obligation undertaken by an acquiring property owner and as an equitable servitude on the property." Id. at 104. The bylaws provided that membership would be granted automatically upon acquisition of title, and that the homeowner would be obliged to pay assessments "from the time the same shall have become due." Id. at 105. Liens would become effective from the time of recordation. Id. at 118. The mortgage foreclosure complaint "sought a judgment barring and foreclosing all defendants of all equity or redemption in and to the property." Id. at 106.

The Court began its discussion by reiterating the principle that the covenants providing for the servitude ran with the land, were valid, enforceable, and binding on all property owners. Id. at 110. Although lacking statutory origin, by virtue of the filing of declarations of covenants, conditions, and restrictions in deeds and association bylaws, HOAs create obligations which bind future property owners. Id. at 110-11. The filed HOA documents serve as notice to subsequent judgment creditors and purchasers. Id. at 111.

"[H]omeowners' association liens are classified as equitable liens because they are created by the covenants contained in members' deeds." Ibid. Such liens combine "a legally cognizable debt and a binding agreement to subject property to the payment of that claim." Ibid. For a covenant to create a lien right in a homeowners' association, the "property owner must have

12

adequate notice." Id. at 112. As the Court explained, "[s]ubsequent bona fide purchasers of property encumbered with an equitable lien take 'subject to the rights of the equitable lienor,' provided there is notice of the lien." Ibid. (quoting 51 Am. Jur. 2d Liens § 18 (2000)). The Court further posited that while the mortgage foreclosure action may have discharged the lien, the underlying debt continued to run with the land. Ibid.

The Court pointed out that under the bylaws, a new owner had an obligation to inquire regarding arrears "and to ensure satisfaction of" any arrears. Id. at 117. On acquisition, a purchaser had to pay arrears. Id. at 118. Although no lien was recorded, the purchaser still had to satisfy arrears accrued by prior owners. Id. at 108, 117, 118.

As the Court stated, the language in the bylaws created "no safe harbor for a less-than-diligent prospective purchaser. On the contrary, . . . the Association [has] the means to enforce its contract rights by recording a lien; it has no effect on the parties' substantive rights and obligations." Id. at 119. In other words, regardless of the status of any recorded lien, a new owner took title subject to the arrears that might exist towards the homeowners' association.

A-2859-20

The HOA bylaws here impose a similarly worded obligation on title owners. The Bank held title for two years and must pay the debt accrued during that period.

"It is well established that membership obligations requiring homeowners in a community to join an association and to pay a fair share toward community maintenance are enforceable as contractual obligations." Id. at 111. "[S]uch recorded covenants also can create a lien on the property." Ibid. Even though these equitable liens may be extinguished by entry of a foreclosure judgment and sale, "[i]t has long been the law in New Jersey that extinguishment of a lien does not affect the validity of the underlying debt that gave rise to the lien." Id. at 114. The debt owed to the HOA by the Bank was still valid after the foreclosure because the HOA and the Declaration continued as a servitude running with the land. The Bank therefore had to pay assessments accrued during its ownership.

Iron Gate at Galloway is not subject to either the New Jersey Condominium Act, N.J.S.A. 46:8B-1 to -38 (because the properties therein are not condominiums), or The Planned Real Estate Development Full Disclosure Act, N.J.S.A. 45:22A-21 to -56 (because the community has less than 100 lots). Regardless, these statutes "may be considered 'instructive' and looked to for guidance" to the extent they address the same subject matter. Mulligan,

14

337 N.J. Super. at 301; see also Cape May Harbor Vill., 421 N.J. Super. at 70. Moreover, "courts should be responsive to legislation as expressive of public policy, which can serve to shape and add content to the common law, even though such legislative expressions may not be directly applicable or binding in the given matter." Carr v. Carr, 120 N.J. 336, 350 (1990). We note that they establish limited lien priority for condominium associations and HOAs owed assessments, thereby demonstrating the Legislature's recognition of the importance of collecting unpaid assessments to sustain common interest communities. See N.J.S.A. 46:8B-21 (for condominium associations); N.J.S.A. 45:22A-44.1 (for HOAs).

The approach taken by Judge Blee accords with the doctrine of equitable subrogation. In modern times, this doctrine provides that New Jersey, a race-notice jurisdiction,[2] may alter the ordinary sequence of priority to satisfy principles of equity. Although the doctrine is rarely applied, its intent is "to ameliorate the harsh consequences of the recording act, by 'permit[ting] the third[-]party lender to inherit, in full or in part, the original lien position of the mortgage that it paid off, even if an intervening lien existed in the meantime."

---

[2] "New Jersey is considered a 'race-notice' jurisdiction, which means that as between two competing parties the interest of the party who first records the instrument will prevail so long as that party had no actual knowledge of the other party's previously-acquired interest." Cox v. RKA Corp., 164 N.J. 487, 496 (2000).

N.Y. Mortg. Tr., 466 N.J. Super. at 398 (alterations in original) (quoting Sovereign Bank v. Gillis, 432 N.J. Super. 36, 44 (App. Div. 2013)). The idea behind the doctrine is to preserve the equitable interest of subsequent lenders where there was neither "prejudice to or justified reliance by a party in adverse interest." Equity Sav. & Loan Ass'n v. Chicago Title Ins. Co., 190 N.J. Super. 340, 342 (App. Div. 1983).

N.Y. Mortgage explains "the doctrine [of equitable subrogation], rooted in principles of equity, is used 'to compel the ultimate discharge of an obligation by the one who in good conscience ought to pay it.'" 466 N.J. Super. at 398-99 (quoting First Union Nat'l Bank v. Nelkin, 354 N.J. Super. 557, 565 (App. Div. 2002)). Those seeking equity must do equity. This project never would have been granted major subdivision approval without an HOA to assume responsibilities that would otherwise fall on the municipality.

Pursuant to the doctrine of equitable subrogation, the ordinary sequence of priority here must be altered. Otherwise, prejudice would result to the individual homeowners who already own lots, and to the municipality, which issued major subdivision approval in reliance on the creation of an HOA.

Thus, Judge Blee's decision not to discharge the sums due or otherwise dissolve the HOA was not an abuse of discretion. This is the rare instance where, in a race-notice jurisdiction, the ordinary sequence of priority must be

16

altered in order to satisfy equitable principles. To do otherwise would result in harsh consequences to the other innocent property owners as well as the municipality. The municipality is not in a position to take back its approval, any more than the individual homeowners are in a position to rescind their purchases.

Furthermore, the Bank has already benefitted from the creation of the HOA. Without the HOA, no portion of the mortgages would have been paid as other owners in the development bought their lots.

The question in this case is not whether pursuant to the race-notice statute, N.J.S.A. 46:26A-12, the HOA exists because it was named in the mortgage foreclosure complaint, or whether the debt for outstanding HOA fees should be paid. The question is whether obtaining "clean" title at a sheriff's sale enables the Bank to bootstrap itself into a position better than any other purchaser responsible for assessments and HOA responsibilities during a period of ownership. The sheriff's sale should not—and could not—have that effect.

Thus, under the doctrine of equitable subrogation, the Declaration of Covenants remains in full force and effect, and the $12,651.35 currently in the hands of the title insurance company should be paid over. The HOA responsibilities and debts could not be extinguished by the foreclosure of a

17

portion of the lots covered by the subdivision approval. These debts run with the land, as does the HOA Declaration, which constitutes an equitable servitude on the land.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

18